Justice ALITO delivered the opinion of the Court.
*294 Our cases firmly establish that police officers may search jointly occupied premises if one of the occupants[1] consents. See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), we recognized a narrow exception to this rule, holding that the consent of one occupant is insufficient when another occupant is present and objects to the search. In this case, we consider whether Randolph applies *1130 if the objecting occupant is absent when another occupant consents. Our opinion in Randolph took great pains to emphasize that its holding was limited to situations in which the objecting occupant is physically present. We therefore refuse to extend Randolph to the very different situation in this case, where consent was provided by an abused woman well after her male partner had been removed from the apartment they shared. *295 I
A
The events involved in this case occurred in Los Angeles in October 2009. After observing Abel Lopez cash a check, petitioner Walter Fernandez approached Lopez and asked about the neighborhood in which he lived. When Lopez responded that he was from Mexico, Fernandez laughed and told Lopez that he was in territory ruled by the "D.F.S.," i.e., the "Drifters" gang. App. 4-5. Petitioner then pulled out a knife and pointed it at Lopez' chest. Lopez raised his hand in self-defense, and petitioner cut him on the wrist.
Lopez ran from the scene and called 911 for help, but petitioner whistled, and four men emerged from a nearby apartment building and attacked Lopez. After knocking him to the ground, they hit and kicked him and took his cell phone and his wallet, which contained $400 in cash.
A police dispatch reported the incident and mentioned the possibility of gang involvement, and two Los Angeles police officers, Detective Clark and Officer Cirrito, drove to an alley frequented by members of the Drifters. A man who appeared scared walked by the officers and said: " '[T]he guy is in the apartment.' " Id., at 5. The officers then observed a man run through the alley and into the building to which the man was pointing. A minute or two later, the officers heard sounds of screaming and fighting coming from that building.
After backup arrived, the officers knocked on the door of the apartment unit from which the screams had been heard. Roxanne Rojas answered the door. She was holding a baby and appeared to be crying. Her face was red, and she had a large bump on her nose. The officers also saw blood on her shirt and hand from what appeared to be a fresh injury. Rojas told the police that she had been in a fight. Officer Cirrito asked if anyone else was in the apartment, and Rojas said that her 4-year-old son was the only other person present.
*296 After Officer Cirrito asked Rojas to step out of the apartment so that he could conduct a protective sweep, petitioner appeared at the door wearing only boxer shorts. Apparently agitated, petitioner stepped forward and said, " 'You don't have any right to come in here. I know my rights.' " Id., at 6. Suspecting that petitioner had assaulted Rojas, the officers removed him from the apartment and then placed him under arrest. Lopez identified petitioner as his initial attacker, and petitioner was taken to the police station for booking.
Approximately one hour after petitioner's arrest, Detective Clark returned to the apartment and informed Rojas that petitioner had been arrested. Detective Clark requested and received both oral and written consent from Rojas to search the premises.[2] In the apartment, the police *1131 found Drifters gang paraphernalia, a butterfly knife, clothing worn by the robbery suspect, and ammunition. Rojas' young son also showed the officers where petitioner had hidden a sawed-off shotgun.
B
Petitioner was charged with robbery, Cal.Penal Code Ann. § 211 (West 2008), infliction of corporal injury on a spouse, cohabitant, or child's parent, § 273.5(a), possession of a firearm by a felon, § 12021(a)(1)(West 2009), possession of a *297 short-barreled shotgun, § 12020(a)(1), and felony possession of ammunition, § 12316(b)(1).
Before trial, petitioner moved to suppress the evidence found in the apartment, but after a hearing, the court denied the motion. Petitioner then pleaded nolo contendere to the firearms and ammunition charges. On the remaining counts-for robbery and infliction of corporal injury-he went to trial and was found guilty by a jury. The court sentenced him to 14 years of imprisonment.
The California Court of Appeal affirmed. 208 Cal.App.4th 100, 145 Cal.Rptr.3d 51 (2012). Because Randolph did not overturn our prior decisions recognizing that an occupant may give effective consent to search a shared residence, the court agreed with the majority of the federal circuits that an objecting occupant's physical presence is "indispensible to the decision in Randolph ." Id., at 122, 145 Cal.Rptr.3d, at 66.[3] And because petitioner was not present when Rojas consented, the court held that petitioner's *298 suppression motion had been properly denied. Id., at 121, 145 Cal.Rptr.3d, at 65.
The California Supreme Court denied the petition for review, and we granted certiorari. 569 U.S. ----, 133 S.Ct. 2388, 185 L.Ed.2d 1103 (2013).
II
A
The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not be issued *1132 without probable cause, but "the text of the Fourth Amendment does not specify when a search warrant must be obtained." Kentucky v. King, 563 U.S. ----, ----, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011). Our cases establish that a warrant is generally required for a search of a home, Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), but "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' " ibid. ; see also Michigan v. Fisher, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (per curiam ). And certain categories of permissible warrantless searches have long been recognized.
Consent searches occupy one of these categories. "Consent searches are part of the standard investigatory techniques of law enforcement agencies" and are "a constitutionally permissible and wholly legitimate aspect of effective police activity." Schneckloth v. Bustamonte, 412 U.S. 218, 228, 231-232, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It would be unreasonable-indeed, absurd-to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search. The owner of a home has a right to allow others to enter and examine the premises, and there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice. Where the owner believes that he or she is under suspicion, the owner may want the police to search the premises so that their suspicions are dispelled. This may be particularly important where the owner has a strong interest in the apprehension of the perpetrator of a crime and believes *299 that the suspicions of the police are deflecting the course of their investigation. An owner may want the police to search even where they lack probable cause, and if a warrant were always required, this could not be done. And even where the police could establish probable cause, requiring a warrant despite the owner's consent would needlessly inconvenience everyone involved-not only the officers and the magistrate but also the occupant of the premises, who would generally either be compelled or would feel a need to stay until the search was completed. Michigan v. Summers, 452 U.S. 692, 701, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).[4]
While it is clear that a warrantless search is reasonable when the sole occupant of a house or apartment consents, what happens when there are two or more occupants? Must they all consent? Must they all be asked? Is consent by one occupant enough? The Court faced that problem 40 years ago in United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).
In that case, Matlock and a woman named Graff were living together in a house that was also occupied by several of Graff's siblings and by her mother, who had rented the house. While in the front yard of the house, Matlock was arrested for bank robbery and was placed in a squad car. Although the police could have easily asked him for consent to search the room that he and Graff shared, they did not do so. Instead, they knocked on the door and obtained Graff's permission to search. The search yielded incriminating *1133 evidence, which the defendant sought to suppress, but this Court held that Graff's consent justified the warrantless search. As the Court put it, "the consent of one who possesses *300 common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Id., at 170, 94 S.Ct. 988.
In Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Court reaffirmed and extended the Matlock holding. In Rodriguez, a woman named Fischer told police officers that she had been assaulted by Rodriguez in what she termed " 'our' apartment." 497 U.S., at 179, 110 S.Ct. 2793. She also informed the officers that Rodriguez was asleep in the apartment, and she then accompanied the officers to that unit. When they arrived, the officers could have knocked on the door and awakened Rodriguez, and had they done so, Rodriguez might well have surrendered at the door and objected to the officers' entry. Instead, Fischer unlocked the door, the officers entered without a warrant, and they saw drug paraphernalia and containers filled with white powder in plain view.
After the search, the police learned that Fischer no longer resided at the apartment, and this Court held that she did not have common authority over the premises at the time in question. The Court nevertheless held that the warrantless entry was lawful because the police reasonably believed that Fischer was a resident. Id., at 188-189, 110 S.Ct. 2793.
B
While consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search, we recognized a narrow exception to this rule in Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). In that case, police officers responded to the Randolphs' home after receiving a report of a domestic dispute. When the officers arrived, Janet Randolph informed the officers that her estranged husband, Scott Randolph, was a cocaine user and that there were "items of drug evidence" in the house. Id. , at 107, 126 S.Ct. 1515 (internal quotation marks omitted). The officers first asked Scott for consent to search, but he "unequivocally refused." Ibid. The officers then turned to Janet, and *301 she consented to the search, which produced evidence that was later used to convict Scott for possession of cocaine.
Without questioning the prior holdings in Matlock and Rodriguez, this Court held that Janet Randolph's consent was insufficient under the circumstances to justify the warrantless search. The Court reiterated the proposition that a person who shares a residence with others assumes the risk that "any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." 547 U.S., at 111, 126 S.Ct. 1515. But the Court held that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant." Id. , at 122-123, 126 S.Ct. 1515 (emphasis added).
The Court's opinion went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present. Again and again, the opinion of the Court stressed this controlling factor. See id. , at 106, 126 S.Ct. 1515 ("present at the scene"); ibid. ("physically present"); id. , at 108, 126 S.Ct. 1515 ("a co-tenant who is present"); id. , at 109, 126 S.Ct. 1515 ("physically present"); id. , at 114, 126 S.Ct. 1515 ("a present and objecting co-tenant"); id. , at 119, 126 S.Ct. 1515 (a co-tenant "standing at the door and *1134 expressly refusing consent"); id. , at 120, 126 S.Ct. 1515 ("a physically present resident"), id. , at 121, 126 S.Ct. 1515 ("a physically present fellow tenant objects"); ibid. ("[A] potential defendant with self-interest in objecting is at the door and objects"); id. , at 122, 126 S.Ct. 1515 ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him"). The Court's opinion could hardly have been clearer on this point, and the separate opinion filed by Justice BREYER, whose vote was decisive, was equally unambiguous. See id. , at 126, 126 S.Ct. 1515 (concurring) ("The Court's opinion does not apply where the objector is not present 'and object[ing]' ").
III
In this case, petitioner was not present when Rojas consented, but petitioner still contends that Randolph is *302 controlling. He advances two main arguments. First, he claims that his absence should not matter since he was absent only because the police had taken him away. Second, he maintains that it was sufficient that he objected to the search while he was still present. Such an objection, he says, should remain in effect until the objecting party "no longer wishes to keep the police out of his home." Brief for Petitioner 8. Neither of these arguments is sound.
A
We first consider the argument that the presence of the objecting occupant is not necessary when the police are responsible for his absence. In Randolph, the Court suggested in dictum that consent by one occupant might not be sufficient if "there is evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." 547 U.S., at 121, 126 S.Ct. 1515. We do not believe the statement should be read to suggest that improper motive may invalidate objectively justified removal. Hence, it does not govern here.
The Randolph dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable. As petitioner acknowledges, see Brief for Petitioner 25, our Fourth Amendment cases "have repeatedly rejected" a subjective approach. Brigham City, 547 U.S., at 404, 126 S.Ct. 1943 (alteration and internal quotation marks omitted). "Indeed, we have never held, outside limited contexts such as an 'inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.' " King, 563 U.S., at ----, 131 S.Ct., at 1859.
Petitioner does not claim that the Randolph Court meant to break from this consistent practice, and we do not think that it did. And once it is recognized that the test is one of objective reasonableness, petitioner's argument collapses.
*303 He does not contest the fact that the police had reasonable grounds for removing him from the apartment so that they could speak with Rojas, an apparent victim of domestic violence, outside of petitioner's potentially intimidating presence. In fact, he does not even contest the existence of probable cause to place him under arrest. We therefore hold that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason.
This conclusion does not "make a mockery of Randolph, " as petitioner protests. Brief for Petitioner 9. It simply accepts Randolph on its own terms. The Randolph holding unequivocally requires the *1135 presence of the objecting occupant in every situation other than the one mentioned in the dictum discussed above.
B
This brings us to petitioner's second argument, viz., that his objection, made at the threshold of the premises that the police wanted to search, remained effective until he changed his mind and withdrew his objection. This argument is inconsistent with Randolph 's reasoning in at least two important ways. First, the argument cannot be squared with the "widely shared social expectations" or "customary social usage" upon which the Randolph holding was based. See 547 U.S., at 111, 121, 126 S.Ct. 1515. Explaining why consent by one occupant could not override an objection by a physically present occupant, the Randolph Court stated:
"[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions." Id., at 113, 126 S.Ct. 1515.
It seems obvious that the calculus of this hypothetical caller would likely be quite different if the objecting tenant *304 was not standing at the door. When the objecting occupant is standing at the threshold saying "stay out," a friend or visitor invited to enter by another occupant can expect at best an uncomfortable scene and at worst violence if he or she tries to brush past the objector. But when the objector is not on the scene (and especially when it is known that the objector will not return during the course of the visit), the friend or visitor is much more likely to accept the invitation to enter.[5] Thus, petitioner's argument is inconsistent with Randolph 's reasoning.
Second, petitioner's argument would create the very sort of practical complications that Randolph sought to avoid. The Randolph Court recognized that it was adopting a "formalis[tic]" rule, but it did so in the interests of "simple clarity" and administrability. Id., at 121, 122, 126 S.Ct. 1515.
The rule that petitioner would have us adopt would produce a plethora of practical problems. For one thing, there is the question of duration. Petitioner argues that an objection, once made, should last until it is withdrawn by the objector, but such a rule would be unreasonable. Suppose that a husband and wife owned a house as joint tenants and that the husband, after objecting to a search of the house, *305 was convicted and sentenced to a 15-year prison term. Under petitioner's proposed rule, the wife would be unable to consent to a search of the house 10 years *1136 after the date on which her husband objected. We refuse to stretch Randolph to such strange lengths.
Nor are we persuaded to hold that an objection lasts for a "reasonable" time. "[I]t is certainly unusual for this Court to set forth precise time limits governing police action," Maryland v. Shatzer, 559 U.S. 98, 110, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), and what interval of time would be reasonable in this context? A week? A month? A year? Ten years?
Petitioner's rule would also require the police and ultimately the courts to determine whether, after the passage of time, an objector still had "common authority" over the premises, and this would often be a tricky question. Suppose that an incarcerated objector and a consenting co-occupant were joint tenants on a lease. If the objector, after incarceration, stopped paying rent, would he still have "common authority," and would his objection retain its force? Would it be enough that his name remained on the lease? Would the result be different if the objecting and consenting lessees had an oral month-to-month tenancy?
Another problem concerns the procedure needed to register a continuing objection. Would it be necessary for an occupant to object while police officers are at the door? If presence at the time of consent is not needed, would an occupant have to be present at the premises when the objection was made? Could an objection be made pre-emptively? Could a person like Scott Randolph, suspecting that his estranged wife might invite the police to view his drug stash and paraphernalia, register an objection in advance? Could this be done by posting a sign in front of the house? Could a standing objection be registered by serving notice on the chief of police?
Finally, there is the question of the particular law enforcement officers who would be bound by an objection. Would *306 this set include just the officers who were present when the objection was made? Would it also apply to other officers working on the same investigation? Would it extend to officers who were unaware of the objection? How about officers assigned to different but arguably related cases? Would it be limited by law enforcement agency?
If Randolph is taken at its word-that it applies only when the objector is standing in the door saying "stay out" when officers propose to make a consent search-all of these problems disappear.
In response to these arguments, petitioner argues that Randolph 's requirement of physical presence is not without its own ambiguity. And we acknowledge that if, as we conclude, Randolph requires presence on the premises to be searched, there may be cases in which the outer boundary of the premises is disputed. The Court confronted a similar problem last Term in Bailey v. United States, 568 U.S. ----, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013), but despite arguments similar to those now offered by petitioner, the Court adopted a rule that applies only when the affected individual is near the premises being searched. Having held that a premises rule is workable in that context, we see no ground for reaching a different conclusion here.
C
Petitioner argues strenuously that his expansive interpretation of Randolph would not hamper law enforcement because in most cases where officers have probable cause to arrest a physically present objector they also have probable cause to search the premises that the objector does not want them to enter, see Brief for Petitioner 20-23, but this argument misunderstands *1137 the constitutional status of consent searches. A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant. Even with modern technological advances, the warrant procedure imposes burdens on the officers who wish to search, the magistrate who must review *307 the warrant application, and the party willing to give consent. When a warrantless search is justified, requiring the police to obtain a warrant may "unjustifiably interfer[e] with legitimate law enforcement strategies." King, 563 U.S., at ----, 131 S.Ct., at 1860. Such a requirement may also impose an unmerited burden on the person who consents to an immediate search, since the warrant application procedure entails delay. Putting the exception the Court adopted in Randolph to one side, the lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search. Any other rule would trample on the rights of the occupant who is willing to consent. Such an occupant may want the police to search in order to dispel "suspicion raised by sharing quarters with a criminal." 547 U.S., at 116, 126 S.Ct. 1515; see also Schneckloth, 412 U.S., at 243, 93 S.Ct. 2041 (evidence obtained pursuant to a consent search "may insure that a wholly innocent person is not wrongly charged with a criminal offense"). And an occupant may want the police to conduct a thorough search so that any dangerous contraband can be found and removed. In this case, for example, the search resulted in the discovery and removal of a sawed-off shotgun to which Rojas' 4-year-old son had access.
Denying someone in Rojas' position the right to allow the police to enter her home would also show disrespect for her independence. Having beaten Rojas, petitioner would bar her from controlling access to her own home until such time as he chose to relent. The Fourth Amendment does not give him that power.
* * *
The judgment of the California Court of Appeal is affirmed.
It is so ordered.

We use the terms "occupant," "resident," and "tenant" interchangeably to refer to persons having "common authority" over premises within the meaning of Matlock . See United States v. Matlock, 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Both petitioner and the dissent suggest that Rojas' consent was coerced. Post, at 1143, n. 5 (opinion of GINSBURG, J.). But the trial court found otherwise, App. 152, and the correctness of that finding is not before us. In suggesting that Rojas' consent was coerced, the dissent recites portions of Rojas' testimony from the suppression hearing that the trial judge appears to have rejected. Ibid. Similarly, the jury plainly did not find Rojas to be credible. At trial, she testified for the defense and told the jury, among other things, that the wounds observed by the officers who came to her door were not inflicted by petitioner but by a woman looking for petitioner during a fight. 208 Cal.App.4th 100, 109-110, 145 Cal.Rptr.3d 51, 56 (2012). The jury obviously did not believe this testimony because it found petitioner guilty of inflicting corporal injury on her.

See United States v. Cooke, 674 F.3d 491, 498 (C.A.5 2012) ("Randolph was a narrow exception to the general Matlock rule permitting cotenant consent, relevant only as to physically present objectors"); United States v. Hudspeth, 518 F.3d 954, 960 (C.A.8 2008) (concluding that "the narrow holding of Randolph, which repeatedly referenced the defendant's physical presence and immediate objection is inapplicable"); United States v. Henderson, 536 F.3d 776, 777 (C.A.7 2008) (recognizing that "Randolph left the bulk of third-party consent law in place; its holding applies only when the defendant is both present and objects to the search of his home"); United States v. McKerrell, 491 F.3d 1221, 1227 (C.A.10 2007) ("Randolph carefully delineated the narrow circumstances in which its holding applied, and ... Randolph consciously employed a rule requiring an express objection by a present co-tenant"); but see United States v. Murphy, 516 F.3d 1117, 1124-1125 (C.A.9 2008) (holding that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant" because "[o]nce a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects").

A main theme of the dissent is that the police in this case had probable cause to search the apartment and therefore could have obtained a warrant. Of course, this will not always be so in cases in which one occupant consents to a search and the other objects, and the dissent does not suggest that a warrant should be required only when probable cause is present. As a result, the dissent's repeated references to the availability of a warrant in this case are beside the point.

Although the dissent intimates that "customary social usage" goes further than this, see post, at 1140, the dissent provides no support for this doubtful proposition. In the present case, for example, suppose that Rojas had called a relative, a friend, a supportive neighbor, or a person who works for a group that aids battered women and had invited that individual to enter and examine the premises while petitioner was in jail. Would any of those invitees have felt that it was beyond Rojas' authority to extend that invitation over petitioner's objection?
Instead of attempting to show that such persons would have felt it improper to accept this invitation, the dissent quickly changes the subject and says that "conjectures about social behavior shed little light on the constitutionality" of the search in this case. Post, at 1140. But the holding in Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), was based on "widely shared social expectations" and "customary social usage." See Id. , at 111, 121, 126 S.Ct. 1515. Thus, the dissent simply fails to come to grips with the reasoning of the precedent on which it relies.