J-A03030-16

2016 PA Super 58

COMMONWEALTH OF PENNSYLVANIA

Appellee

v.

TARIK JAHAD DAVIS

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 3432 EDA 2014

Appeal from the Judgment of Sentence November 7, 2014
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0001490-2014

BEFORE: GANTMAN, P.J., MUNDY, J., and DUBOW, J.

OPINION BY MUNDY, J.: **FILED MARCH 04, 2016**

Appellant, Tarik Jahad Davis, appeals from the November 7, 2014 aggregate judgment of sentence of four years less a day to eight years less two days, imposed after a jury convicted him of two counts of possession with intent to deliver (heroin and marijuana) and one count of possession of drug paraphernalia.[1] After careful review, we affirm.

The trial court recited the pertinent background of this case as follows.

> [Appellant] was unanimously found guilty by a jury on September 9, 2014, of [two counts of possession with intent to deliver and one count of possession of drug paraphernalia]. At the time of trial, the jury made a specific unanimous

---

[1] 35 P.S. §§ 780-113(a)(30) and (32), respectively.

determination that the aggregate weight of the heroin possessed by [Appellant] with the intent to deliver exceeded five (5) grams. Further, the jury unanimously found that at the time of the commission of the underlying offenses, [Appellant] was in possession of a Maverick Model 88 twelve-gauge shotgun that was in close proximity to the heroin.

…

The verdict was returned on September 9, 2014, and [Appellant] was found guilty on all charges. The verdict slip included two interrogatories which required that the jury determine the weight of the heroin possessed, if the jury found [Appellant] guilty of Possession of Heroin with Intent to Deliver. The verdict slip indicates the jury found the weight of the heroin to be between five (5) and less than ten (10) grams. Further, the jury verdict slip included an interrogatory requiring the jury to deliberate as to whether or not [Appellant] possessed or controlled a firearm, the 12 gauge shot gun. The jury rendered a verdict in the affirmative.

Trial Court Opinion, 5/6/15, at 1, 4. Further, the trial court summarized the subsequent procedural history as follows.

On November 7, 2014, [the trial court] sentenced [Appellant] to an aggregate sentence of 48 months less a day (27 months for Possession of Heroin with Intent to Deliver, 15 months less one day for Possession of Marijuana with Intent to Deliver, and 6 months for Possession of Drug Paraphernalia) to 96 months less two days, which was within the sentencing guidelines in the aggravated range, with each sentence running consecutive to the others.

…

No post-trial motion was filed by [Appellant]. However, a timely Notice of Appeal was filed. [The

- 2 -

trial court] required [Appellant] to submit a Concise Statement of Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925.

*Id.* at 2, 4.

On appeal, Appellant presents two issues for our review as follows.

1. Whether the trial court erred when it denied [Appellant's] motion to suppress after police secured and searched [Appellant's] residence without consent, without a warrant and without a valid exception to the requirement for a warrant.

2. Whether the trial court erred with its use of a special verdict slip with questions on the weight of the drugs and presence of a firearm?

Appellant's Brief at 4.

In his first issue, Appellant contends that police searched his residence "without a warrant, without consent and without an exception to justify a warrantless search." *Id.* at 6. Appellant specifically maintains the police "conducted an illegal entry into [Appellant's] residence while waiting for [a] search warrant to be considered." *Id.* at 6-8.

Our standard of review from an order denying a suppression motion is as follows.

[W]e may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Russo*, 934 A.2d 1199, 1203 (Pa. 2007) (citation omitted).

Here, our independent review of the record reveals that Appellant did not call any witnesses at the suppression hearing,[2] while the Commonwealth presented uncontradicted testimony from three law enforcement officers. Bethlehem Police Detective Patrick Maczko testified to being a seven-year member of the Northampton County Drug Task Force and conducting an ongoing investigation of drug dealing by Appellant. N.T., 9/8/14, at 21-22. On February 24, 2014, Detective Maczko worked with a confidential informant, who went to Appellant's residence at 2263 Rodgers Street, Apartment 14, to purchase heroin. *Id.* at 22-27. This was one of Detective Maczko's five controlled purchases from Appellant using a confidential informant. *Id.* at 32. The fifth controlled purchase occurred on March 3, 2014, after which Detective Maczko "went into headquarters to try to obtain a search warrant." *Id.* at 32-33. While Detective Maczko was pursuing the search warrant, Appellant exited his residence and was taken into police custody. *Id.* at 34.

_____

[2] Appellant's counsel stated that he "discussed this matter with [Appellant] and [his girlfriend] and it's my client's direction at this time that we do not offer any testimony including specifically the testimony of [Appellant's girlfriend] here today. Is that correct, [Appellant]?" N.T., 9/8/14, at 89. Appellant replied, "Correct." *Id.*

- 4 -

Detective Maczko attempted to procure the warrant at 3:20 p.m., but it took him almost two hours.[3] He explained the delay as follows.

> I was attempting to procure the search warrant at approximately 3:20. Between 3:20 and 3:30, I called Judge Narlesky's office. I was advised by the staff that Judge Narlesky had left for the day, he had gone to the racquetball club. They said I could get a search warrant from any of the other magistrates.
>
> At that point, I called Judge Manwaring's office, he was gone for the day. After that, I called Judge Matos-Gonzalez's office. She said she would sign the search warrant, so I sent it right over. I advised her that I had guys watching the house and that we were in a rush to try to get the search warrant.
>
> I sent her the search warrant, she called me back and said she didn't know why she was signing a search warrant for Judge Narlesky's office since he was supposed to be in court at that time it being prior to 4 o'clock. I said that it was not my issue, I could not find the Judge, I needed a search warrant, I had men sitting on the house, we had [Appellant] in custody for prior deliveries, and we were trying to get the search warrant so we could execute it as quickly as possible. She refused to sign it at that point saying it was Judge Narlesky's problem to find someone to cover his office.
>
> She called over to Judge Narlesky's office and made [his staff] aware of that[.] A short time later, approximately 4 o'clock, I got a call from Judge Narlesky from his cell phone indicating that he was at the racquetball club, [and] that he would not be back at his office. It would take him approximately

_____

[3] The warrant was time-stamped by the magistrate at 17:05 and Detective Maczko received the fax at 17:19. *Id.* at 41, 53.

> 30 minutes to get back to the office, and, in that case, I might as well just wait until 4:30 and get the search warrant signed by the on-call judge.
>
> At that point I indicated – throughout this whole time I'm calling Detectives Hammer, Schaedel and Benton, via radio, indicating to them what the situation was, the runaround I was getting for the search warrant. They, at one point, said they were going to try to knock on the door and make contact with [Appellant's girlfriend] that we knew to be in the residence from prior surveillance. We saw her and the child go into the residence prior to the last buy.
>
> … Judge Yetter, the on-call judge, signed the search warrant at 17:05 or 5:05 hours PM.

*Id.* at 35-37. Detective Maczko testified that as soon as the signed warrant was faxed to him, he "immediately got in [his] car and drove as fast as [he] could to [Appellant's] house." *Id.* at 40.

While Detective Maczko was attempting to procure the warrant, other officers went to Appellant's residence. *Id.* at 52. Detective Maczko testified as follows.

> We had constant communication back and forth. We were having discussion as a vice unit, per se, on what the best route was to go because of the problem I was having with the judges. At that point, someone suggested, I don't know which detective, suggested knock on the door and try to make contact with [Appellant's girlfriend] and ask for consent. That's what actually occurred.

*Id.* at 52-53.

Next, Bethlehem Police Officer Erik Kaintz testified to being assigned to the Bethlehem Housing Authority on March 3, 2014, and assisting with the

investigation of Appellant. *Id.* at 56. Officer Kaintz stopped Appellant after he left his residence and placed him under arrest. *Id.* at 58.

Finally, Bethlehem Police Detective Jason Hammer testified to working with special operations and the Northampton County Drug Task Force on March 3, 2014. Detective Hammer testified as follows.

> [Appellant] had already left the residence and was stopped and was in custody. At that point, Detective Maczko was working on getting the search warrant for the residence. At that point we went to the residence to see if we could make contact with any occupants to obtain consent to search.

*Id.* at 62. Detective Hammer explained that he and his partner knocked on the door and Appellant's girlfriend "answered the door and we identified ourselves and we asked if we could step inside **and she permitted us to come inside**." *Id.* at 66-67, 72 (emphasis added). Detective Hammer and his partner entered the residence and advised Appellant's girlfriend that Appellant was in custody and police "were obtaining a search warrant for the residence for drugs." *Id.* at 67. The officers asked Appellant's girlfriend for permission to search the residence and she declined. *Id.* at 68, 73. Detective Hammer testified "at that point there was no further searching of the residence." *Id.* at 74. However, Detective Hammer's partner remained with Appellant's girlfriend while Detective Hammer "went upstairs and checked the remainder of the rooms to make sure nobody else was in there, checked beside the doors, the bed, opened up the closet doors." *Id.* Detective Hammer said "the sweep" lasted "maybe 20 seconds, 30 seconds"

- 7 -

to "make sure nobody else was inside the residence." **Id.** Detective Hammer testified that during the sweep, he was not looking for narcotics or any evidence, and did not observe, search for or seize anything of evidentiary value. **Id.** at 68-70. He said the purpose of the sweep was "for officer safety, to make sure they're not going to injure us or hurt us." **Id.** at 81. When he was finished, Detective Hammer returned downstairs and stayed with his partner and Appellant's girlfriend until Detective Maczko radioed that he had secured the search warrant. **Id.** at 69-70.

Based on the foregoing testimony, the trial court denied Appellant's suppression motion and summarized its reasoning as follows.

> Here, [Appellant] was validly arrested, the police were invited into the home, the police conducted a protective sweep only to rule out the presence of other persons, no illegal activity was observed inside the home, and then they awaited the approval of the search warrant, which was based on information gathered lawfully, prior to their entry into the home.

Trial Court Opinion, 5/6/15, at 22.

Our review of the facts of record and legal authority comports with the trial court's determination. Appellant cites **Commonwealth v. Melendez**, 676 A.2d 226 (Pa. 1995) to support his contention that "police conducted an illegal entry into [Appellant's] residence while waiting for [the] search warrant to be considered." Appellant's Brief at 7. Like the trial court, we find **Melendez** distinguishable. Unlike Appellant in this case, Ms. Melendez was stopped improperly by police because she "was not engaged in any

- 8 -

activity at the time she was stopped which would cause a person of reasonable caution to believe that she was then engaged in criminal conduct." *Melendez*, *supra* at 228. Moreover, when the police returned with Ms. Melendez to her home, "she *certainly* did not freely and voluntarily consent to the police entry into her house." *Id.* at 230 (emphasis in original).

Instantly, Appellant does not challenge his stop by police, nor did he present any evidence at the suppression hearing to contradict Detective Hammer's testimony that his girlfriend permitted police to enter the residence, although she subsequently denied police permission to search the residence. As it is undisputed that Appellant's girlfriend was a co-occupant of the residence, she was permitted under the Fourth Amendment to consent to the warrantless entry, since Appellant was not present to object to the entry. *See Fernandez v. California*, 134 S. Ct. 1126, 1133-1135 (2014) (concluding that a girlfriend who occupied an apartment with Fernandez may validly give consent to search their apartment when the defendant was not present to object to the same). As a result, Appellant's Fourth Amendment rights were not violated by the police's warrantless entry.

In addition, Appellant disregards that no contraband was recovered as a result of the police action in securing – not searching – Appellant's residence. Detective Hammer testified that there was no search prior to receipt of the warrant. N.T., 9/8/14, at 68-70 (stating he did not "observe"

"seize" "collect" or "convey to Detective Maczko" anything of evidentiary value during the sweep). Accordingly, we discern no error by the trial court in denying Appellant's suppression motion.

In his next issue, Appellant asserts that the trial court acted improperly by providing the jury with a verdict slip that included questions regarding the weight of the drugs and the presence of a firearm recovered from Appellant's residence. Appellant cites our Supreme Court's recent decision in **Commonwealth v. Hopkins**, 117 A.3d 247, 260 (Pa. 2015) (rejecting the Commonwealth's assertion that special verdicts—"or, as expressed at oral argument, the finding of a general verdict with special interrogatories"—may cure the constitutional deficiencies of a statute). Appellant adds that the special verdict slip in this case "was not done for [Appellant's] benefit. It was done so that his sentence could be increased." Appellant's Brief at 10. Appellant further maintains that the verdict slip was "contrary to law and an abuse of discretion" and Appellant "was prejudiced by the presence of the special verdicts." **Id.** Significantly, Appellant does not explain **how** he was prejudiced.

The Commonwealth concedes "it was improper for the trial court to include questions on the verdict slip related to possible mandatory minimum sentences." Commonwealth's Brief at 14. The Commonwealth notes "at the time the verdict slip was used, mandatory minimum sentences based on the weight of a drug had not yet explicitly been declared unconstitutional," and

"at the time of Appellant's trial [prior to the **Hopkins** decision] the trial court and the parties were still trying to rectify the various appellate decisions and the constitutional mandate of **Alleyne**."[4]   **Id.** at 13, 14 n.8.   The Commonwealth explains the "uncertainty led to the positioning of this matter, in which the trial court included questions on the verdict slip asking the jury to determine the weight of the heroin and whether Appellant possessed a firearm."  **Id.** at 13.  Nonetheless, the Commonwealth counters that the trial court's special verdict slip in this case was "harmless" because although it asked the jury two questions relating to the drug weight and firearm mandatory minimums, the trial court did not impose any mandatory minimums when sentencing Appellant.  **Id.** at 11-15.

At the conclusion of trial, the trial court expressed its awareness of the implications with sentencing Appellant to mandatory minimums, stating as follows.

> If the mandatories are described [sic] unconstitutional and I choose to sentence [Appellant] based on the mandatories, then my sentence is exposed for being found to be unconstitutional.

N.T., 9/9/14, at 187.

Two months later, at sentencing, the trial court further discussed the issue with the parties as follows.

---

[4] **Alleyne v. United States**, 133 S. Ct. 2151 (2013).

> [Appellant] pled not guilty and the jury returned a verdict of guilty on all of the charges. I believe they also, on the verdict form, found that [Appellant] possessed a gun, but we're not applying the mandatory for that or the enhancement, as [the Commonwealth] has opted not to pursue that even though there was proof beyond a reasonable doubt finding by the jury with regard to the weapon because there is a question as to whether or not the statute applies to the enhancement and the mandatory will be found to be unconstitutional once the Supreme Court weighs in on that, is that correct?
>
> [COMMONWEALTH:]    Your Honor, that is correct as far as the enhancement.

N.T., 11/7/14, at 3-4.

The trial court subsequently sentenced Appellant without applying the mandatory minimums. As the Commonwealth observes, "[t]here is no evidence that the questions on the verdict slip affected the jury's deliberation as to guilt or innocence on the underlying charges in any way[.]" Commonwealth's Brief at 4. Upon review, we agree. Accordingly, we find no merit to Appellant's second issue regarding the verdict slip, and affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/4/2016

- 12 -