ELMORE, Judge.
 

 *345
 
 Defendant Stanley Melvin Mitchell entered an
 
 Alford
 
 guilty plea to robbery with a dangerous weapon following the trial court's denial of his motions to suppress evidence obtained from a search of his home as well as evidence of his identification by the robbery victim. Pursuant to the terms of his plea agreement with the State, defendant appeals the denial of his two motions. We affirm.
 

 I. Background
 

 On 17 January 2014, Officers Nicole Saine and Marvin Francisco of the Charlotte-Mecklenburg Police Department (CMPD) responded to a report of domestic violence at the home defendant shared with his girlfriend,
 
 *53
 
 Kristy Fink. In addition to reporting the domestic violence incident, the 9-1-1 caller had further alleged that Ms. Fink suspected defendant of being involved in the armed robbery of a Game Stop store a few days prior to the incident.
 

 The officers knocked on the front door upon arriving at the home, and defendant and Ms. Fink eventually answered and exited the home together. Pursuant to CMPD policy, the officers then separated defendant and Ms. Fink for questioning. Officer Saine remained outside the home with defendant, while Officer Francisco entered the home with Ms. Fink after being authorized by her to do so.
 

 Inside the home, Ms. Fink confirmed that she had been assaulted by defendant; she also corroborated the 9-1-1 caller's allegation by telling Officer Francisco that the incident began when she confronted defendant about the robbery. Ms. Fink then led Officer Francisco to the shared upstairs bedroom to view potentially incriminating evidence she had found prior to the incident, which included money and clothing that matched the description of the robbery suspect's clothing. When Officer Saine entered the home at defendant's request for warmer clothing while he waited outside, Ms. Fink gave her the same information she had given Officer Francisco. The officers subsequently obtained a search warrant and conducted a search of the home based on the information provided by Ms. Fink.
 

 On 12 May 2014, a grand jury indicted defendant for one count of robbery with a dangerous weapon. The State alleged that on 15 January 2014, defendant robbed a Game Stop store and threatened to use a firearm against an employee, Robert Cintron, in the commission of the robbery. Although Mr. Cintron had failed to identify any alleged perpetrator in a photographic lineup shown to him two days after the robbery, he later identified defendant when shown a single still-frame photograph obtained from the store's surveillance video. Mr. Cintron then identified
 
 *346
 
 defendant as the perpetrator in the same photographic lineup shown to him two days after the robbery and again in four close-up, post-arrest photographs of defendant showing his neck tattoos.
 

 Prior to trial, defendant filed a motion to suppress evidence obtained from the search of his home "because valid consent was not obtained" for the officers' initial entry into the home, and because the subsequent search warrant "was issued without probable cause and was invalid to authorize the search." Defendant also filed a motion to suppress both in-court and out-of-court identification by Mr. Cintron "of the defendant ... as the person that robbed the Game Stop, because the out[-]of[-]court identification was so unnecessarily suggestive as to create a substantial likelihood of irreparable misidentification and any in-court identification would not be independent in origin from the impermissible out-of-court identification." After a hearing in which Officer Saine, Officer Francisco, defendant, and Mr. Cintron testified, the trial court denied defendant's two motions in written orders entered 20 April 2017.
 

 On 6 October 2017, defendant pled guilty to robbery with a dangerous weapon pursuant to
 
 North Carolina v. Alford
 
 ,
 
 400 U.S. 25
 
 ,
 
 91 S.Ct. 160
 
 ,
 
 27 L.Ed.2d 162
 
 (1970), as well as a plea agreement that preserved his right to appeal the trial court's denial of his motions to suppress. This appeal followed.
 

 II. Discussion
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982) (citations omitted). We review the trial court's conclusions of law
 
 de novo
 
 .
 
 State v. Hughes
 
 ,
 
 353 N.C. 200
 
 , 208,
 
 539 S.E.2d 625
 
 , 631 (2000).
 

 A. Motion to Suppress Evidence Obtained from Search
 

 Defendant first contends the trial court erred in denying his motion to suppress evidence discovered in the search of his home "because it was obtained in violation of his
 
 *54
 
 constitutional rights to be free from unreasonable searches and seizures." According to defendant, the officers' initial entry into the home was illegal; thus, the fruits of the subsequent search should have been suppressed. We disagree.
 

 Defendant relies primarily on the United States Supreme Court's holding in
 
 Georgia v. Randolph
 
 ,
 
 547 U.S. 103
 
 ,
 
 126 S.Ct. 1515
 
 ,
 
 164 L.Ed.2d 208
 
 (2006), to support his argument that the officers were not justified in their initial
 
 *347
 
 entry into his home. In
 
 Randolph
 
 , officers asked a married couple for permission to search their marital residence; one spouse refused permission, while the other spouse consented to the search.
 

 Id.
 

 at 107
 
 ,
 
 126 S.Ct. at 1519
 
 . The non-consenting spouse was later charged with possession of cocaine based on evidence the officers obtained during their search.
 

 Id.
 

 at 107-08
 
 ,
 
 126 S.Ct. at 1519-20
 
 . At trial, the non-consenting spouse moved to suppress the evidence as a "product[ ] of a warrantless search of his house unauthorized by his wife's consent over his express refusal."
 
 Id
 
 . The trial court denied the defendant's motion to suppress, holding that the consenting spouse "had common authority to consent to the search."
 
 Id
 
 . The Supreme Court disagreed, holding that "one occupant may [not] give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search."
 

 Id.
 

 at 108
 
 ,
 
 126 S.Ct. at 1520
 
 .
 

 In response to defendant's argument, the State contends that
 
 Randolph
 
 is inapposite here for the reasons set forth in
 
 Fernandez v. California
 
 ,
 
 571 U.S. 292
 
 ,
 
 134 S.Ct. 1126
 
 ,
 
 188 L.Ed.2d 25
 
 (2014). The Supreme Court refined
 
 Randolph
 
 in
 
 Fernandez
 
 , emphasizing that
 
 Randolph
 
 's "holding was limited to situations in which the objecting occupant is physically present" and refusing to extend that holding "to the very different situation in [
 
 Fernandez
 
 ], where consent was provided by an abused woman well after her male partner had been removed from the apartment they shared."
 
 Fernandez
 
 ,
 
 571 U.S. at 294
 
 ,
 
 134 S.Ct. at 1130
 
 . We likewise conclude that
 
 Randolph
 
 's holding does not extend to the facts of the instant case.
 

 Here, the trial court made the following findings of fact in its order denying defendant's motion to suppress evidence obtained from the search of his home:
 

 4. In order to fulfill their policy of separating the parties in domestic calls, Officer Saine stayed on the front steps with the defendant, and Officer Francisco was authorized by Miss Fink to enter the residence, where he conducted his original domestic disturbance interview of Miss Fink.
 

 ....
 

 7. During Officer Francisco's investigation in the home with Miss Fink, the defendant was outside on the front steps with Officer Saine.
 

 8. Although the defendant indicated that he wanted to be in the residence while any officers were in the residence,
 
 *348
 
 the defendant never expressly refused permission of the officers to enter the residence themselves.
 

 9. Officers did not conduct a warrantless search, but were simply shown evidence items by Miss Fink in support of her suspicion that the defendant committed the robbery, which had been the subject of the domestic altercation.
 

 10. On the basis of the display of these items of possible evidence, the officers subsequently obtained a search warrant and conducted a search of the residence per search warrant duly obtained.
 

 ....
 

 14. Neither Officer Saine nor Francisco were sure if the defendant asked other officers who arrived later in the scene not to enter the residence, but the Court finds specifically, based on the totality of the circumstances, that in point of time [sic], had the defendant requested the later arriving officers not to enter the residence, this would have been after Kristy Fink had already told Francisco what she suspected about the robbery and after she had already displayed the potential robbery evidence to them.
 

 ....
 

 17. The defendant testified at the hearing and stated that Miss Fink had told him that she and Whitney, a friend [who defendant
 
 *55
 
 suspected as the 9-1-1 caller], had discussed Miss Fink's suspicion that the defendant had robbed the store in question.
 

 Based on its findings of fact, the trial court concluded as a matter of law:
 

 4. The police in this matter did not conduct a warrantless search of the residence, but were simply shown certain items of evidence of the robbery of a particular video game store possibly perpetrated by the defendant.
 

 5. The defendant never expressly refused Officers Saine or Francisco to enter into the residence. He only indicated his desire to be present inside if and when the officers were inside the residence.
 

 6. Miss Fink's statements to Officers Francisco and Saine during the initial domestic investigation, which concerned
 
 *349
 
 possible implication of the defendant in a particular robbery, provided probable cause to them to obtain a search warrant and to arrest the defendant for the robbery.
 

 [7]. These items of evidence displayed by Miss Fink to Officer Saine and Officer Francisco are not fruits of the poisonous tree and, therefore, are admissible.
 

 [8]. Neither the defendant's constitutional nor statutory rights were violated herein.
 

 Defendant specifically challenges finding no. 8 and conclusion no. 5-that defendant never objected to the officers entering his home-as "legally erroneous because [defendant] was tricked into believing the officers were not there to search his residence for evidence of crimes other than domestic violence." Defendant similarly challenges finding no. 9 and conclusion no. 4-that officers did not conduct a warrantless search of the residence. He asserts that "Officer Francisco's entry into the residence under the subterfuge of investigating a domestic violence complaint followed by his participation in a private search of [defendant's] bedroom and nightstand for evidence of a robbery was a warrantless search within the meaning of the Fourth Amendment." We disagree.
 

 The trial court's finding and conclusion that defendant never objected to the officers entering his home is supported by Officer Saine's testimony that although defendant appeared "reluctant to stay outside" and "wanted to go back inside," defendant "did not state officers could not be in his residence." Like
 
 Fernandez
 
 , this is a very different situation from the one in
 
 Randolph
 
 , which involved a co-tenant "standing at the door and expressly refusing consent."
 
 Randolph
 
 ,
 
 547 U.S. at 119
 
 ,
 
 126 S.Ct. at 1526
 
 . Moreover, defendant's contention that the officers' entry into the home to investigate the allegations of domestic violence was a mere subterfuge to investigate the robbery is meritless. The evidence shows that the officers were dispatched to the home in response to a 9-1-1 call reporting an incident of domestic violence. When they arrived at the home, the officers separated the parties pursuant to CMPD policy, and Ms. Fink corroborated the information provided by the 9-1-1 caller. Finally, the evidence supports the trial court's finding and conclusion that officers did not participate in a warrantless search, where Ms. Fink simply showed the officers items she had discovered prior to their arrival at the home.
 
 Cf.
 

 State v. Kornegay
 
 ,
 
 313 N.C. 1
 
 , 10,
 
 326 S.E.2d 881
 
 , 890 (1985) ("Mere acceptance by the government of materials obtained in a private search is not a seizure so long as the materials are voluntarily relinquished to the government."). As defendant's contention that the subsequent search warrant was issued without probable cause and
 
 *350
 
 was thus invalid to authorize the search assumes that the officers' initial entry into the home and gathering of information was unlawful, this argument is likewise overruled.
 

 Because the trial court's findings of fact are supported by at least some competent evidence, and because those findings in turn support the trial court's conclusions of law, we hold that the trial court properly denied defendant's motion to suppress evidence obtained from the search of his home.
 

 B. Motion to Suppress Identification Evidence
 

 In his second and final argument on appeal, defendant contends the trial court erred in denying his motion to suppress identification evidence "because the State conducted an impermissibly suggestive pretrial identification
 
 *56
 
 procedure that created a substantial likelihood of misidentification and violated [defendant's] right to due process." We disagree.
 

 Here, the trial court made the following findings of fact in its order denying defendant's motion to suppress in-court and out-of-court identification evidence:
 

 1. That on January 17, 2014, defendant was arrested for robbery of the GameStop store on January 15th, 2014. The alleged victim was shown six separate photos in a photo lineup on January 17, 2014, which was conducted substantially pursuant to procedures outlined in the statutes and the CMPD policies. However, the alleged victim failed to identify the defendant or any other alleged perpetrator during that photo lineup.
 

 2. On February 18, 2015, in the course of trial preparation, the then assistant district attorney and two officers who had arrived at the scene of the alleged robbery on January 15, 2014, showed the alleged victim a single color photo, which is asserted by the affidavit of the defendant's counsel, upon information believed to be a single photo of one of the frames from the surveillance video, which the witness, that is, the alleged victim, identified as the defendant. This was the first time that the alleged victim identified the defendant. Thereupon, the alleged victim was shown the same or similar group of photos as the original photo lineup of January 17, 2014 and he identified the defendant as the perpetrator who was Number 3 in the course of that photo examination.
 

 *351
 
 3. On March 21, 2017, again in trial preparation, the then assistant district attorney met with the alleged victim and showed multiple notes, which included four close-up post-arrest photos of the defendant showing his neck tattoos, and the victim again identified the defendant in the four photos as the alleged perpetrator.
 

 ....
 

 6. ... [T]he alleged victim asserted that he could identify the defendant in the photo from the "creases in his forehead and tattoos."
 

 7. The statutory and CMPD policy rules were primarily followed with some deviation in the photo lineups in this case, with the January 17, 2014, photo lineup almost precisely following the statutory and CMPD policy requirements.
 

 8. The substance of any deviation from the statutory requirements and the CMPD policies revolved around the defendant's tattoos, and once the victim was shown closeup photos of defendant's tattoos, he made the identification in the matter.
 

 Based on its findings of fact, the trial court concluded as a matter of law:
 

 1. The authorities substantially followed statutory and CMPD policies in each photo lineup.
 

 2. Any deviation was principally the result of earlier photos not portraying with sufficient clarity the defendant's tattoos, which the victim had observed at the alleged robbery.
 

 3. This issue is why a less suggestive process could not be used and was not used, which would have comported more precisely with CMPD policy and the statute.
 

 4. The totality of the facts and circumstances surrounding the question of any in-court or out-of-court identification of the defendant by the alleged victim is not unduly or impermissibly suggestive, and no less suggestive procedure could reasonably have been used by the authorities.
 

 5. The procedures used by the authorities herein in regards to the identification question of the defendant did
 
 *352
 
 not give rise to a substantial likelihood that this defendant was mistakenly identified as the perpetrator allegedly in this case.
 

 Defendant specifically challenges finding nos. 7 and 8 as well as conclusion no. 4-that the authorities substantially followed statutory and CMPD policies in each photo lineup, and that the substance of any deviation from those policies revolved around defendant's tattoos. He contends that "[t]he problem with that reasoning is that it assumes the police had their man and they merely needed confirmation from the witness." According to defendant, "[w]hen the assistant district attorney showed Mr. Cintron a single, color photo of Mr. Mitchell, he essentially told Mr.
 
 *57
 
 Cintron, 'This is the guy we think robbed the Game Stop store.' .... Such a procedure was inherently suggestive." Defendant ultimately challenges conclusion no. 5-that the procedures used by the authorities "did not give rise to a substantial likelihood that this defendant was mistakenly identified as the perpetrator." We disagree with defendant's argument.
 

 A "show-up" identification is the practice of "showing suspects singly to persons for the purpose of identification, and not as part of a lineup[.]"
 
 State v. Oliver
 
 ,
 
 302 N.C. 28
 
 , 44,
 
 274 S.E.2d 183
 
 , 194 (1981) (quotation marks omitted). As the State emphasizes here, the suggestive nature of show-ups is not fatal to their admissibility at trial.
 
 See
 

 State v. Turner,
 

 305 N.C. 356
 
 , 364,
 
 289 S.E.2d 368
 
 , 373 (1982) ("Pretrial show-up identifications ..., even though suggestive and unnecessary, are not
 
 per se
 
 violative of a defendant's due process rights."). Rather, "[a]n unnecessarily suggestive show-up identification does not create a substantial likelihood of misidentification where under the totality of the circumstances surrounding the crime, the identification possesses sufficient aspects of reliability."
 

 Id.
 

 (citing
 
 Manson v. Brathwaite
 
 ,
 
 432 U.S. 98
 
 , 106,
 
 97 S.Ct. 2243
 
 , 2248,
 
 53 L.Ed.2d 140
 
 (1977) ).
 

 Here, trial court's challenged findings and conclusion-that the authorities substantially followed statutory and CMPD policies in each photo lineup and that the substance of any deviation from those policies revolved around defendant's neck tattoos-are supported by the evidence. Defendant fit Mr. Cintron's initial description of the perpetrator, which emphasized "a neck tattoo of an Asian symbol on the left side of his neck" as well as the "lining" or notable creases in the perpetrator's forehead. Based on this description, Mr. Cintron had the ability to identify defendant both in-court and in photographs reflecting a close-up view of defendant's tattoos, and he specifically testified to
 
 *353
 
 his ability to recognize defendant as the perpetrator "independent of any lineup ... or any photo" he had been shown. Thus, the trial court's ultimate conclusion-that the procedures used by the authorities did not give rise to a substantial likelihood that defendant was mistakenly identified as the perpetrator-is supported by the totality of the circumstances indicating that the identification was sufficiently reliable.
 

 Because the totality of the circumstances supported the reliability of Mr. Cintron's in-court and out-of-court identification of defendant, we hold that the trial court properly denied defendant's motion to suppress identification evidence.
 

 III. Conclusion
 

 Where officers did not conduct a warrantless search of defendant's home, and where the identification of defendant by the robbery victim was sufficiently reliable, the trial court properly denied defendant's motions to suppress.
 

 AFFIRMED.
 

 Judges DILLON and DAVIS concur.