**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2495-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KIRK J. PUGH, a/k/a
HUGH PUGH,

     Defendant-Appellant.

_____

Submitted May 26, 2020 – Decided July 13, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 15-02-0127.

Joseph E. Krakora, Public Defender, attorney for appellant (Janet Anne Allegro, Designated Counsel, on the brief).

Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (Nancy Anne Hulett, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial court denied his motions to suppress and to proceed pro se, a jury convicted defendant Kirk Pugh of third-degree theft, N.J.S.A. 2C:20-2(b)(2)(D). The same court also denied defendant's post-trial motion for a judgment of acquittal and subsequently sentenced him to a discretionary persistent offender extended term of eight years in prison with four years of parole ineligibility pursuant to N.J.S.A. 2C:44-3(a) and assessed applicable fines and penalties.

Defendant raises the following issues on appeal:

> POINT I
>
> THE POLICE MADE A WARRANTLESS ARREST OF DEFENDANT IN HIS HOME VIOLATING HIS CONSTITUTIONAL RIGHT TO PRIVACY, THEREFORE THE SUBSEQUENT SEIZURE OF HIM AND SEARCH OF HIS PERSON AND HOME WAS UNCONSTITUTIONAL, WARRANTING A REVERSAL OF THE CONVICTION.
>
> A.    The Court Incorrectly Applied the Standards of Terry v. Ohio, 392 U.S. 1 (1968) to the Present Unconstitutional Arrest and Search.
>
> B.    Detective Hamer Testified Incredibly Regarding His Encounter with [Defendant] at His Home.
>
> C.    A Warrant and Probable Cause was Required for the Arrest and Search of [Defendant].

POINT II

SINCE THE POLICE DID NOT CONDUCT A LAWFUL ARREST AND DETENTION OF DEFENDANT, ENTERING HIS HOME WAS UNLAWFUL WHILE HE WAS BEING DETAINED INSIDE A POLICE CAR RIGHT IN FRONT OF HIS HOME AND THE COURT ERRED IN GRANTING A RECONSIDERATION OF THE SUPPRESION ORDER REGARDING ITEMS FOUND INSIDE THE HOME.

POINT III

INADMISSIBLE LAY OPINION TESTIMONY FROM THE INVESTIGATING DETECTIVES IDENTIFYING DEFENDANT AS THE PERSON IN THE SURVEILLANCE FOOTAGE DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL AND VIOLATED THE COURT'S DIRECTIVES PRECLUDING SUCH TESTIMONY.

POINT IV

THE TRIAL COURT ERRED BY NOT GRANTING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AFTER A GUILTY VERDICT WAS RENDERED.

POINT V

THE TRIAL COURT FAILED TO APPLY THE CORRECT LEGAL STANDARD REGARDING DEFENDANT'S REQUEST TO PROCEED PRO SE.

POINT VI

THE SENTENCE IMPOSED BY THE TRIAL COURT
WAS UNDULY EXCESSIVE.

After reviewing the record in light of the contentions on appeal and the applicable law, we affirm.

I.

We glean the following facts from the record developed during the suppression hearing and trial. On October 18, 2014, at around 11:00 p.m., Detective Theodore Hamer of the Edison Police Department (EPD) received a phone call regarding an incident at an Edison gas station. He responded to the scene and reviewed surveillance video footage of the incident provided by the owner. Hamer testified that when reviewing the footage, he observed a male wearing glasses inside a vehicle getting gas. He then stated that as the attendant removed the gas nozzle from the vehicle's tank, "the individual gets out of the car and as he approaches [the attendant], he appears to be holding . . . a knife in his right hand." Hamer then observed the individual "grabbing the attendant with his left hand and push[ing] him down to the ground. And then you can see him . . . go through the victim's pockets with his left hand before getting back in the car and fleeing the scene."

Officer Wilfredo Brown, also of the EPD, brought the victim, Mohammad Aslam, to police headquarters for an interview. Hamer stated that Aslam

4

informed him that "when he put the gas cap back on the vehicle, the driver exited his vehicle, grabbed him, threw him to the ground, went through his pockets, and stole approximately $300 and then fled the scene on Route 1 South." Aslam described the perpetrator to Hamer as "a black male in his late [forties]" and that he "was wearing a hat and a hooded sweatshirt pulled up." Hamer stated that Aslam's description was consistent with his review of the surveillance footage.

Hamer also noted that from the video footage, he was able to read the front license plate of the vehicle. He eventually determined that the registered owner of the vehicle was Donna Tutt, a resident of North Brunswick. Hamer testified that he contacted the North Brunswick Police Department, who dispatched officers to Tutt's residence in order to determine whether the same vehicle was at the home. The officers informed Hamer that the vehicle was at the residence.

Hamer, Brown, and another EPD officer drove to the residence and observed the vehicle, as well as "the apartment with the lights on inside." Hamer testified that he knocked on the front door, and after what "might have been a minute or so," a man "who looked like the guy from the video," later identified as defendant, opened the door. He described defendant as "a black male, approximately [fifty] years old, approximately [five feet eight inches] tall" and stated, "he was carrying a white tee shirt at the time" and "had glasses on."

From this point forward, Hamer's testimony of events differs drastically from defendant's. Hamer testified that when defendant opened the door, "as he walked outside the apartment, he asked without any solicitation, 'Is this about the incident at the gas station[?]'" At that time, Hamer "looked [defendant] up and down" and "saw a bulge in his front right pocket," which prompted him to "conduct . . . a pat down to make sure there [were] no weapons on him."

Hamer testified he conducted a pat down because "after watching the video, . . . I wanted to make sure that he didn't have any weapons on him." Hamer stated that as he patted down the outside of defendant's pants, he "heard a jingle of . . . keys and . . . felt a hard object which would be consistent with a knife." He retrieved a "box-cutter-type folding knife and a set of keys" from defendant's pocket, placed him in handcuffs, and seated him in the back of Brown's patrol vehicle.

Hamer also stated that Tutt, defendant's sister, asked what was happening and "invited us into her house . . . to explain to her what was going on." In a voluntary recorded statement, Tutt informed Hamer and Brown that "she just came back from work," and that "shortly after she came home . . . defendant came home, us[ed] her car, and told her that he stopped at a friend's house . . . to borrow money and had to get gas in the car."

6

During the course of the conversation, Brown notified Hamer that he noticed "a black zippered sweatshirt and a . . . black and silver . . . baseball cap . . . on the edge of the couch in the living room that we were standing in." Hamer testified that he recognized that clothing from the surveillance video and as a result, he and Brown seized the clothing.

While waiting for a towing company to arrive to impound the vehicle, Hamer testified that he returned to Brown's patrol car, where defendant was seated, "told [defendant] that he was under arrest[,] and . . . verbally [M]irandized him because I knew we were going to be in the car driving back to headquarters." Hamer indicated he did not carry a Miranda[1] card with him because he knew defendant's Miranda rights from memory.

In transporting defendant to the EPD, Hamer testified he did not ask defendant questions while in the patrol car, but that "[defendant] was making some statements in the back of the car." According to Hamer's report, defendant stated, "I was only arguing with the gas station attendant over how much gas he put in my car," and that he reiterated this "a few times." Hamer admitted, however, that while Brown's patrol car possessed a motor vehicle recording

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2495-17T2

(MVR) unit, he did not know "if it was operational at the time" and that he did not "believe it was activated."

At headquarters, a search of defendant during processing revealed two cell phones, cash, and a bail bonds receipt. Hamer then brought defendant to the interview room and read his Miranda rights from a written form. Defendant initialed that he understood his rights but elected not to waive them and did not provide a statement.

As noted, defendant's version of events at the house and in the patrol vehicle differed significantly from Hamer's. He testified that at around 2:00 a.m., he was in bed and heard "banging" on the front door. Defendant stated he was sleeping in a t-shirt and underwear, so he quickly put more clothes on and went to the door. He testified that he looked out the window and saw "a group of police." As defendant opened the door, he stated that he did not "step out," but that he stepped to the door front. He testified that Hamer "grabbed [him] . . . right above [his] tricep . . . [and] pulled [him] out the door." Defendant reiterated that he did not step outside because there was "no need for [him] to go outside," he "had [prior] interactions with the police," and it was "freezing" outside.

Defendant stated that Hamer led him "about [twenty] feet away . . . [to] the sidewalk in front of [his] house," and that the other officers "boxed [him] in." Defendant claimed he tried to close his front door because his sister was purportedly sick, but Hamer "grabbed [him] up again" and informed him not to worry about the door, while "the other three stepped into [him], reaching for the mace or guns." Defendant stated that for three minutes, Hamer refused to answer why defendant was removed from his house. In response, defendant testified he refused to answer Hamer's question as to who was inside the house. Defendant testified that he did not feel free to leave at this time.

According to defendant, Hamer then asked where defendant was earlier that night and asked whether he was at a gas station. Defendant stated he had been at work, not at a gas station, and again asked to close the door, a request which Hamer refused. In response, Hamer stated "somebody should [have] told you they . . . put new cameras in that gas station." According to defendant, Hamer stated that he had a video on his phone which indicated that defendant committed the robbery and placed defendant in handcuffs, informing him he was under arrest.

At this point, defendant testified that Hamer "pulled the utility razor that [he] uses to work with out of [his] front pocket," then "grabbed everything out

of [his] pockets," including his wallet. After Hamer placed defendant in the back of a nearby patrol vehicle, defendant testified that Hamer walked toward the residence and defendant stated, "don't go in my house." As noted, Hamer and Brown then obtained consent to speak with Tutt inside the house and seized defendant's clothing.

After Hamer and Brown spoke with Tutt, defendant testified that he was brought to the police station, informed of his Miranda rights, and subsequently refused to provide a statement. Defendant specified that, contrary to Hamer's testimony, he was not informed of his Miranda rights prior to being taken to the police station.

On February 3, 2015, a grand jury returned an indictment charging defendant with: 1) first-degree robbery, N.J.S.A. 2C:15-1; 2) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); 3) third-degree possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(d); 4) fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and 5) obstructing administration of law, N.J.S.A. 2C:29-1(b).

Defendant filed a motion to suppress the physical evidence seized in his home and the statements he made to the police. Defendant asserted that the police failed to issue Miranda warnings prior to defendant's alleged statement in

the patrol vehicle that "I was only arguing . . . with the gas attendant over the gas." Further, defense counsel argued that the police improperly entered his home because prior to Tutt inviting the officers inside, defendant unequivocally instructed that they were not permitted to enter the home.

Moreover, he claimed that the police, in violation of Payton v. New York, 445 U.S. 573 (1980), violated defendant's privacy rights in his home by arresting him without a warrant. Based on these alleged violations, defendant sought suppression of the knife, cell phones, sweatshirt, hat, and alleged statements made to the police.

In a nine-page December 9, 2015 written opinion and corresponding order, the court granted defendant's motion to suppress with respect to the clothing recovered in the home, "any statements made by defendant during the initial encounter with police," and "any statements made by defendant while being transported to the police station," but denied his motion to suppress the knife.

In its decision, the court described the divergent testimonies of Hamer and defendant. With regard to the suppression of the knife, the court concluded that "[t]he initial encounter between [defendant] and the police started as a proper investigatory stop" pursuant to Terry v. Ohio, 392 U.S. 1 (1968), and State v. Nishina, 175 N.J. 502 (2003). Because defendant's "physical appearance was

11

similar to the person observed on the video surveillance and the car used in the robbery was present in the vicinity," the court determined that sufficient probable cause existed to arrest defendant. In this regard, the court noted that defendant conceded "that he was searched following his arrest," during which the knife was discovered and confiscated. The court concluded that this constituted a lawful investigatory stop and search incident to arrest.

With respect to defendant's alleged statements made to the officers, the court explained that it was unpersuaded that defendant "volunteered the statement about the incident at the gas station immediately upon his encounter with the police, at his front door." It found "[t]his description of [defendant]'s behavior . . . contrary to how [defendant] has acquitted himself during various court proceedings" because defendant "is a belligerent, contentious, and quarrelsome individual and it seems unlikely . . . that he calmly made the statement attributed to him upon his initial encounter with police." As such, it suppressed "any statement [defendant] made during the initial encounter with police."

The court likewise suppressed any alleged statement by defendant while being escorted to the police station in Brown's patrol vehicle. In this regard, the court reconciled "the conflicting testimony" by concluding that "[i]t is more

12

likely, especially based on [defendant's] behavior while testifying, that he challenged the officers over what they were doing, questioned their motives, and refused to meekly acquiesce to police authority as portrayed by Det. Hamer." The court also noted that the State's position was "severely undermined" by the failure to activate the MVR in the vehicle.

Finally, the court suppressed the sweatshirt and baseball cap confiscated by the police from inside defendant's home, reasoning that defendant "was a resident who shared the apartment with his sister" and he "unequivocally told the police they could not enter his home" while still present at the scene. As such, the court held that "the police cannot circumvent that denial of consent by subsequently approaching his sister to gain access to [defendant]'s residence," pursuant to Georgia v. Randolph, 547 U.S. 103 (2006). As the court determined the police were not lawfully inside defendant's home, it rendered the sweatshirt and baseball cap discovered in plain view inside the home inadmissible.

The State filed a motion for reconsideration regarding only the admissibility of the clothing discovered inside the home. In support of its motion, the State argued that the court failed to consider Fernandez v. California, 571 U.S. 292 (2014), and State v. Lamb, 218 N.J. 300 (2014). On May 23, 2015, the trial court denied the State's motion.

A-2495-17T2

However, on May 26, 2015, the court issued a written decision and corresponding order granting the State's motion for reconsideration. In its opinion, it discussed the relevant factual circumstances and holdings in Fernandez and Lamb and determined that the issue regarding whether the police properly entered defendant's home rested on "whether [defendant] was still physically present at the time his sister gave consent to search the residence, as was the case in Randolph," or if defendant "was lawfully removed from the scene pursuant to a valid arrest . . . as was the case in Fernandez . . . and Lamb." While the court expressed "misgivings" regarding the Fernandez decision, it stated that it would "apply the law in its current state" and concluded that defendant "was lawfully removed from the scene and no longer 'present' to object to the search of his residence." Thus, the court reversed that portion of its prior order suppressing the sweatshirt and baseball cap discovered inside defendant's home.

On January 27, 2017, defendant orally moved to proceed pro se. At a hearing on February 16, 2017, the court began an inquiry consisting of "an open-ended discussion" to determine whether defendant was knowingly and

intelligently waiving his Sixth Amendment right to counsel.[2]  When asked whether he had ever studied law, defendant indicated that he completed a program for a paralegal certificate at Northern State Prison.  Further, the court extensively questioned defendant regarding the elements of his charges, defenses, and potential sentence.  For example, defendant described the elements of first-degree robbery as "bodily injury or possession of a weapon with intent to cause bodily harm" in connection with a "theft or unlawful taking."  And, with regard to aggravated assault, defendant stated that it consisted of "intent to do bodily injury where the person needs medical attention."  Throughout this colloquy, defendant noted that he did not possess "the experience and knowledge of lawyers," but that he would continue to study and reference books and statutes at trial.  Moreover, defendant understood that the State's burden was beyond a reasonable doubt, though he struggled to define precisely that term.

　　With regard to his defenses, defendant noted that the State could not establish the elements of the charges brought against him.  And, regarding his range of punishment were he to be convicted, defendant stated that although the

---

[2]  We note that contrary to Rule 2:5-3, we were not provided with either the January 27, 2017 or the February 16, 2017 transcripts until we specifically requested them and after the appeal was fully briefed.

prosecutor sought a discretionary persistent offender extended term, he did not qualify because "it's a ten-year parameter for the last time you were released or the last time you committed a crime." He stated that he was unsure of the possible sentence for first-degree robbery, but that he could reference the statutes for that answer. He also informed the court that he verified he was not "extended-term eligible or three strikes eligible."

The following month, on March 7, 2017, the court continued its inquiry of defendant. It questioned defendant regarding how his lack of knowledge of the New Jersey Court Rules and the New Jersey Rules of Evidence would affect his representation. In response, defendant stated that with the assistance of side counsel, "I think I would do just fine, very fine," and indicated that he understood that his lack of understanding of the rules could impair his ability to present certain witnesses or facts to the jury. Further, defendant stated that he understood that "there are restrictions on what you can say in openings or arguments to a jury" and "on the way questions are asked of witnesses" and that side counsel would assist him with technical issues that arise in connection with trial.

When asked whether he understood that the dual role of counsel and defendant "may hamper [his] effectiveness in presenting [his] defense,"

defendant stated that he would "be limited to certain things [he] can say or present" so that he was not perceived as testifying on his own behalf, and that he did not intend to testify. Similarly, with regard to his "understanding of the negative effect" that proceeding pro se would "have on [his] right to remain silent and the privilege against self-incrimination," defendant expressed his intention not to take the stand and that he would "minimize the risks by sticking strictly to the facts of the case, sticking to all the paperwork, all the discovery that [he had] received."

Moreover, when the court asked defendant about technical issues that he may encounter in light of "the necessity to comply with the court rules and the rules of evidence," he replied: "[r]eally, I see no problem, Your Honor. I see no problem. If I ask the proper questions and stay within the guidelines, like I say, of the rules, not doing anything improper, I should have no difficulties." He also acknowledged the potential of being held in contempt or subject to other sanctions if he engaged in improper decorum.

The court also questioned defendant regarding specific legal principles. By way of example, defendant expressed his intention to call character witnesses to establish that he had a habit of "going to work and . . . caring for [his] sister" so that he could not have been at the scene of the robbery. When the court

17

informed defendant that "that's not going to work" because "that's not what habit and routine is about," defendant responded "[y]eah, it is." Defendant also indicated that he did not know how to subpoena witnesses and that he would be "limited to certain things" that he was permitted to say during opening and closing arguments, without providing specifics.

The court concluded that defendant did not "have the understanding of the evidence rules, the evidence concepts, or the rules of court . . . to adequately . . . represent" himself. In this regard, it found that defendant did not "indicate any kind of substantive understanding of the rules and of the law that someone representing themselves would need . . . to be able to . . . adequately represent[] themselves in court." And, the court stated its view that defendant would be unable to put forth a defense "because there are many concepts which [he] [does not] . . . understand about the substantive law, the evidential rulings, the court rules, [and] the evidential concepts to be able to move this case forward . . . without making a mockery of justice." As such, the court determined that it was uncomfortable with defendant's ability to "knowingly, intelligently, and voluntarily exercise [his] right to represent [him]self" and accordingly denied defendant's motion.

The case proceeded to trial between April 25, 2017 and May 4, 2017. Following the State's opening statement, defendant moved to dismiss the indictment, and the court denied the motion. The State presented the live testimony of Aslam, Hamer, Brown, North Brunswick Officer Darren Carroll, and Tutt, as well as documentary evidence. The defense called Investigator William Vogel and defendant to testify.

Aslam testified that the perpetrator was "an African-American individual" wearing a cap and a black jacket. He stated that the perpetrator approached him, put his hand in Aslam's pocket, and removed about $300. As this occurred, Aslam testified that he "fell to the floor," but that he was not sure whether he "hit something or [the perpetrator] pushed." When Aslam fell, the perpetrator "came onto me and hit me in my chest" using his right hand and asked Aslam whether he had more money. After Aslam responded in the negative, the perpetrator got back into his car and drove away. Aslam testified that he was able to see the perpetrator's hands and that he was not holding anything.

Hamer's trial testimony, as at the suppression hearing, concerned the factual circumstances of the investigation. In addition, the court played the surveillance video for the jury and Hamer indicated that he was able to identify the license plate from that video. Brown also testified that he reviewed the

19

surveillance footage and got "a very good description of the suspect" as well as the license plate number.  Further, Brown stated that at defendant's residence, the police recovered the sweatshirt and that he "observed the suspect in the video surveillance wearing that item."

Carroll testified that he arrived at the residence, located the vehicle matching the license plate of the suspect, and waited for Hamer and Brown to arrive.  Tutt then testified that her co-worker had driven her to work on the day of the alleged incident.  She stated that defendant arrived home about ten minutes after her and informed her that he had taken her car "[f]or gas to go to work."  She further mentioned that defendant had access to her car "every day to go to work."  Tutt also stated that she spoke with the police inside her home and recorded a statement before the officers seized defendant's clothing.

At the close of the State's case, defendant moved for a judgment of acquittal pursuant to Rule 3:18-1 and State v. Reyes, 50 N.J. 454 (1967).  The court denied defendant's motion, but the State voluntarily dismissed the obstructing administration of law count due to insufficient evidence.

Defendant first presented the testimony of Vogel, an investigator who searched the vehicle's registration. Vogel testified that his search revealed that an individual who was not defendant or Tutt "had been issued several motor

vehicle violations while utilizing that vehicle." Finally, defendant testified regarding the factual scenario at his house and, as noted, it differed greatly from Hamer's account. Defendant maintained that he did not use Tutt's car that night and was not at the scene of the robbery.

After the jury convicted defendant of third-degree theft and issued not guilty verdicts on the remaining counts, defendant filed a motion for a judgment of acquittal or a new trial which the court denied. Defendant argued that because Aslam did not identify defendant and the sweatshirt in evidence did not match the description of the suspect's jacket, the verdict was against the weight of the evidence. In its oral decision, the court "re-incorporat[ed] much of [its] decision at the end of the State's case." It determined that although Aslam did not identify defendant, Hamer did. Further, the court noted that the jury was able to review the surveillance tape multiple times, and that "[t]he video is unbelievably clear that the individual in the vehicle is [defendant]."

At sentencing, the court found that defendant was subject to a discretionary persistent offender extended term pursuant to N.J.S.A. 2C:44-3(a) and sentenced defendant to eight years' imprisonment with four years' parole ineligibility, as well as related fees and penalties. In support of that sentence, the court relied upon aggravating factors three, "[t]he risk that the defendant will

commit another offense," N.J.S.A. 2C:44-1(a)(3), six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted," N.J.S.A. 2C:44-1(a)(6), and nine, "the need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9).

With regard to aggravating factor three, the court noted that defendant's "first contact with the criminal justice system was in 1983," and that he had been convicted of eight crimes, the latest of which being the jury verdict in this instance. As such, it found a risk that defendant would reoffend, and the court "attache[d] great weight" to that factor.

In applying aggravating factor six, the court outlined defendant's extensive criminal history, which included: a robbery, conspiracy to commit a drug offense, receiving stolen property, carjacking, and other convictions. The court "attach[ed] great weight to that prior history given the significance of the number of convictions, the time in between, the chronology, and the significance of the offenses by degrees."

The court determined that there was "a need for deterring the defendant from violating the law," and also attached "[g]reat weight" to that factor. It found no mitigating factors and accordingly found that the aggravating factors substantially outweighed the mitigating factors. This appeal followed.

## II.

Defendant first argues in Point I.A of his merits brief that his conviction should be reversed because he was unlawfully seized without a warrant. Specifically, he contends that in denying defendant's motion to suppress, the court incorrectly applied the Terry standard for an investigatory stop to the facts before it. We disagree and affirm, albeit for slightly different reasons than those stated by the motion court. See El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 169 (App. Div. 2005) (recognizing that an appellate court's function is to review orders, not reasons, and that we can affirm a trial court's orders without adopting its legal reasoning).

An appellate court reviewing a motion to suppress "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Handy, 206 N.J. 39, 44 (2011) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). "Video recorded evidence is reviewed under the same standard." State v. Hagans, 233 N.J. 30

A-2495-17T2

(2018).  The court's legal conclusions, however, are reviewed de novo and not entitled to deference by an appellate court.  Handy, 206 N.J. at 45.

Both the United States and New Jersey Constitutions guarantee an individual's right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  A warrantless search is "presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement."  State v. Wilson, 178 N.J. 7, 12 (2003) (citing State v. Cooke, 163 N.J. 657, 664 (2000)).  The State has the burden of proving the reasonableness of a warrantless arrest.  State v. Brown, 205 N.J. 133, 144-45 (2011); see also Payton, 445 U.S. at 585.

Areas of a property open to the public are subject to a diminished expectation of privacy.  See State v. Johnson, 171 N.J. 192, 209 (2002).  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  Id. at 209 (alteration omitted) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)).  Thus, areas open to full view from the street are not "part of the curtilage . . . protected by the Fourth Amendment."  Id. at 208.  Further, a warrant is not required for the police to knock on a front door "[i]n connection with an ongoing investigation."  Brown, 205 N.J. at 146 (citing State v. Domicz, 188 N.J. 285, 302-03 (2006)).

A-2495-17T2

"[I]t is not a constitutional imperative for police officers to secure arrest warrants when practicable as long as the arrest is supported by probable cause." State v. Henry, 133 N.J. 104, 111 (1993). Probable cause consists of "more than mere suspicion but less than legal evidence necessary to convict." Sanducci v. City of Hoboken, 315 N.J. Super. 475, 480 (App. Div. 1998). It is a "well-grounded" suspicion that an offense has been committed. State v. Moore, 181 N.J. 40, 45 (2004). "Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (alterations in original) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). In determining whether probable cause existed, a court should consider the "totality of the circumstances," ibid., including the police officer's "'common and specialized experience,'" Schneider v. Simonini, 163 N.J. 336, 362 (2000) (quoting State v. Contursi, 44 N.J. 422, 431 (1965)).

Here, the motion court found that after the police viewed the video from the gas station's surveillance cameras and "confirmed the presence of the suspect vehicle that was observed in the surveillance video of the robbery" as well as

that "the apartment [was] associated with the vehicle's registration," they approached the home. As part of the investigation, Hamer knocked on defendant's door. The court found that when defendant answered the door, Hamer "stated the door was opened by an African[-]American male who appeared to him to be the individual who was in the video he observed." It further noted that "based on the ability to physically observe [defendant], . . . Hamer determined that sufficient probable cause existed to arrest [defendant] for the gas station robbery" because "[h]is physical appearance was similar to the person observed on the video surveillance and the car used in the robbery was present in the vicinity."

Based on the motion court's factual findings, we conclude that Hamer lawfully arrested defendant. As the license plate of the car in the driveway matched the license plate of the car in the video, Hamer knocked on the door in the course of his investigation of the robbery and did not require a warrant to do so. Further, when defendant answered the door and looked to Hamer like the assailant in the surveillance video, in conjunction with the aforementioned circumstances regarding the vehicle in the driveway, Hamer possessed sufficient probable cause to arrest defendant. As such, no warrant was required for Hamer to make that arrest. See Henry, 133 N.J. at 111.

A-2495-17T2

III.

In Point I.B, defendant maintains that because the motion court found that certain elements of Hamer's testimony were not credible, it should also have concluded that, consistent with defendant's account and not Hamer's, defendant "was physically pulled through the threshold of his home and never voluntarily placed himself in a public area." We disagree.

As there is no reasonable expectation of privacy at the threshold of a doorway, it is a "public place" in which a person may be arrested without a warrant so long as the police have probable cause to believe a felony has been committed. See State v. Nikola, 359 N.J. Super. 573, 582-83 (App. Div. 2003); United States v. Santana, 427 U.S. 38, 42 (1976); cf. State v. Jefferson, 413 N.J. Super. 344 (App. Div. 2010) (determining that an arrest was unlawful where the officer crossed the threshold of the front door by placing her body in the doorway in order to prevent the defendant from closing it).

Here, because Hamer had probable cause to arrest defendant without a warrant, it is immaterial whether the court made an explicit credibility determination as to whether defendant stepped out onto the porch upon answering the front door. In both versions of events, defendant voluntarily opened the door of his home. Further, according to defendant, he was standing

in the threshold, which, as noted, has been recognized as a public place because of the lack of a reasonable expectation of privacy at that location.  See Santana, 427 U.S. at 42; Nikola, 359 N.J. Super. at 582.

IV.

Defendant argues in Point I.C that his arrest and subsequent search was unlawful because none of the exceptions to the warrant requirement applied. Defendant asserts that "[s]ince [he] was in the privacy of his residence when confronted by the police, a warrant and probable cause both were required for a search and seizure of his person."  He contends that because the alleged robbery occurred hours before the arrest and search, the police were required to obtain a warrant.

"[T]he search incident to arrest exception to the warrant requirement was [recognized] for two specific purposes—the protection of the police and the preservation of evidence . . . ."  State v. Eckel, 185 N.J. 523, 524 (2006).  To that end, the exception allows "the arresting officer to search" both "the arrestee's person and the area 'within his immediate control'" in order to prevent the arrestee from obtaining a weapon or destroying evidence.  Chimel v. California, 395 U.S. 752, 763 (1969).  While questions abound about the permissible geographical area beyond the person of an arrestee that may be

lawfully searched, "no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee." United States v. Robinson, 414 U.S. 218, 225 (1973).

Indeed, "[t]he authority to search the person incident to a lawful custodial arrest," although "based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Id. at 235. Instead, because a lawful "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment[,] . . . a search incident to the arrest requires no additional justification," and the mere "fact of the lawful arrest which establishes the authority to search" justifies "a full search of the person." Ibid.

While a search incident to a lawful arrest is permissible, the "exception . . . is not limitless in terms of purpose or scope." State v. Dangerfield, 171 N.J. 446, 461 (2002). First and foremost, ordinarily, "[a] search incident to an arrest must be contemporaneous with that arrest." State v. Bradley, 291 N.J. Super. 501, 510 (App. Div. 1996). Further, as with all searches, a search incident to arrest must be reasonable. Fundamentally, "[w]hether a search is reasonable under the Fourth Amendment 'depends on [the totality] of the circumstances

surrounding the search . . . and the nature of the search . . . itself.'"  State v. O'Hagen, 189 N.J. 140, 149 (2007) (quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989)).

As previously discussed, the court did not err in concluding that the officers' arrest of defendant was lawful, as they had probable cause to believe that defendant committed the robbery at the time of the arrest.  As such, no discrete exception to the warrant requirement was required to perform the arrest of defendant.  See Henry, 133 N.J. at 111.

Further, the trial court did not err when it concluded that the search of defendant that revealed a knife in his front pocket was a proper search incident to a lawful arrest.  In this regard, it resolved the factual discrepancy as to whether the knife was recovered incident to an arrest or by plain feel by crediting defendant's own testimony.  It stated that defendant "concede[d] . . . that he was searched following his arrest, and that is when the knife was recovered from his person."  Indeed, defendant testified that after Hamer placed handcuffs on him, Hamer "went to searching me.  He pulled the utility razor . . . out of my front pocket."  The search was clearly temporally proximate to the arrest and was reasonable given Hamer's belief that the perpetrator in the surveillance video, who he felt physically matched his observations of defendant, was holding a

knife while committing the robbery.  As such, the arrest and subsequent search of defendant's person were lawful, and the knife was properly admitted at trial.

V.

In Point II, defendant argues that because he "repeatedly told the police they were not allowed to go inside his home," the court erred in granting the State's motion for reconsideration regarding suppression of the sweatshirt and baseball cap.  In this regard, he contends that reconsideration was improper because "the consent provided by . . . Tutt was done when [defendant] was improperly being held by the police and he undisputedly refused them entry into his home," in violation of Randolph.  Again, we disagree.

Under Rule 4:49-2, a court "may reconsider final judgments or orders within twenty days of entry."  Lee v. Brown, 232 N.J. 114, 126 (2018).  "'[T]he trial court has the inherent power . . . to review, revise, reconsider, and modify its interlocutory orders at any time prior to the entry of final judgment.'"  Lombardi v. Masso, 207 N.J. 517, 534 (2011) (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987)).  Although Rule 4:49-2 does not expressly apply to criminal practice, courts have nevertheless applied its standards to motions for reconsideration in criminal actions.  See, e.g., State v. Puryear, 441 N.J. Super. 280, 294-95 (App. Div. 2015) (applying

Rule 4:49-2 and Rule 1:7-4(b) to a trial court's decision to grant reconsideration on its earlier decision on a motion to suppress).

Reconsideration is "a matter within the sound discretion of the [c]ourt." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). Reconsideration is "not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion . . . ." Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010). Rather, courts should grant reconsideration motions only when either: "(1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Fusco v. Bd. of Educ. of City of Newark, 349 N.J. Super. 455, 462 (App. Div. 2002) (quoting D'Atria, 242 N.J. Super. at 401); see also R. 4:49-2.

Here, the court admitted that it failed to consider the Fernandez and Lamb decisions when determining whether defendant was "physically present" for the purposes of denying a consent search while he was in the back of the patrol car, and whether Tutt properly permitted the officers into the home. "Authority to consent to search a particular area of a home turns on common usage . . . ." State v. Cushing, 226 N.J. 187, 201 (2016). "[C]onsent may be obtained from the

A-2495-17T2

person whose property is to be searched, from a third party who possesses common authority over the property, or from a third party whom the police reasonably believe has authority to consent." State v. Maristany, 133 N.J. 299, 305 (1993) (citations omitted).

Defendant relies upon Randolph, 547 U.S. at 120, in which the United States Supreme Court concluded that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Further explaining its ruling, the Court stated that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, [who is] nearby but not invited to take part in the threshold colloquy, loses out." Id. at 121.

Subsequently, in Fernandez, 571 U.S. at 303, the Court ruled that the holding of Randolph does not apply when the objecting occupant is absent when another occupant consents. In Fernandez, the police had removed the defendant from the apartment before seeking consent from the co-occupant. Ibid. Therefore, he was not present at the time the co-occupant consented, and the holding of Randolph did not apply. Ibid.

In State v. Coles, 218 N.J. 322, 337-40 (2014), our Supreme Court

reviewed the United States Supreme Court's precedents on consent searches of

homes, and stated:

> We take from Fernandez two things: (1) that the
> objective-reasonableness test prevails; and (2) that
> police responsibility for the unlawful detention or
> removal of a tenant who was prevented from being
> present at the scene to voice his or her objection to the
> search is not equivalent to other neutral circumstances
> causing the defendant's absence.
>
> [Id. at 340.]

The Court held in Coles that the police had unlawfully detained the

defendant. Id. at 327. Therefore, the subsequent search of his bedroom was

invalid, notwithstanding that his aunt may have had authority to authorize the

search. Id. at 347-48.

By contrast, in Lamb, 218 N.J. at 304-05, the Court held that consent to

search was validly obtained from the defendant's mother, where the defendant

and his stepfather, who previously objected to a search, had left the home and

were detained. The Court held that the stepfather's previous objection was no

longer valid once he had departed the home. Id. at 305, 319-22. In determining

that consent was valid, the Court considered that "[t]here is no suggestion that

the police contrived the absence of any occupant to frustrate a physically present

occupant's ability to consent to a search of the home" and that "the police had probable cause to arrest defendant . . . and to detain [the defendant's stepfather] once he left the house." Id. at 322.

In the present case, as discussed, the court accepted that "[d]efendant credibly testified . . . that during the exchange with police he unequivocally told them that they could not enter his home" prior to his arrest. However, the record reflects that defendant was lawfully arrested at his home and placed in Brown's patrol car. Once in the vehicle, defendant was effectively removed from the scene as in Fernandez and Lamb, and for purposes of the consent search analysis, was "nearby but not invited to take part in the threshold colloquy." Randolph, 547 U.S. at 121; see also Fernandez, 571 U.S. at 303 (holding that an occupant who is absent as a result of a lawful arrest "stands in the same shoes as an occupant who is absent for any other reason"); United States v. Matlock, 415 U.S. 164 (1973) (upholding the validity of a consent search where a co-occupant provided consent while the defendant was arrested and placed in a police vehicle outside the home). Moreover, as in Lamb, once defendant was removed from the scene, "[his] earlier objection to police was no longer effective" and Tutt "had full authority to consent to a search of her home." Lamb, 218 N.J. at 320-21 (citing Fernandez, 571 U.S. at 303).

Further, there is no indication that Hamer arrested defendant "to frustrate [defendant's] ability to consent to a search of the home," Lamb, 218 N.J. at 322, as we have determined that Hamer possessed ample probable cause to arrest defendant and defendant does not contend that Tutt lacked the authority to consent to a search of her home. As such, we conclude that the motion court did not abuse its discretion in reconsidering its earlier order suppressing the clothing recovered in defendant's home and determining that defendant was not physically present for the purposes of denying a consent search.

VI.

Further, defendant claims in Point III that Hamer and Brown improperly identified him at trial as the perpetrator of the crime in the surveillance video. Specifically, he argues that the State assured the court "that such opinions would not be rendered" and the court issued an "undisputed directive . . . that the detectives would not be allowed to testify as an expert regarding the video or render an opinion regarding the identification of the perpetrator." Allegedly violating this directive, Hamer stated that when defendant opened the door to his home, defendant "looked like the guy from the video," so he conducted a pat-down search. Similarly, Brown testified that "[a] male matching the description in the video surveillance answered the door." Defendant argues that

these statements constitute impermissible lay opinion testimony regarding identification of defendant as the perpetrator. We are not persuaded.

Lay opinion testimony is permitted when it is "rationally based on the perception of the witness" and "will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. Lay opinion testimony "is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." State v. McLean, 205 N.J. 438, 462 (2011). "[T]estimony in the form of an opinion, whether offered by a lay or an expert witness, is only permitted if it will assist the jury in performing its function." Ibid. "The Rule does not permit a witness to offer a lay opinion on a matter . . . as to which the jury is as competent as he to form a conclusion . . . ." Id. at 459 (internal quotation marks and citation omitted). Furthermore, a police witness is not permitted to offer an opinion regarding a defendant's guilt. State v. Frisby, 174 N.J. 583, 593-94 (2002) (disapproving police testimony that opined regarding innocence of one person and inferentially the guilt of the defendant); State v. Landeros, 20 N.J. 69, 74-75 (1955) (holding that a police captain's testimony that defendant was "as guilty as Mrs. Murphy's pet pig" caused "enormous" prejudice warranting reversal).

A-2495-17T2

These principles apply to opinions regarding an offender's identity. "In an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant." State v. Lazo, 209 N.J. 9, 24, 34 (2012).

In Lazo, the issue was whether it was proper for a detective with no personal knowledge of the crime to testify at trial that he included the defendant's photo in a photo array because the defendant's photo resembled the composite sketch of the assailant. Id. at 12. The Lazo Court held that the detective's testimony violated N.J.R.E. 701 because his opinion was not based on personal knowledge and the testimony only served to bolster the victim's identification, which was the sole basis of the defendant's conviction. Id. at 24. The detective did not witness the crime, did not know the defendant, and relied solely on the victim's description. Ibid. The Lazo Court held that a police officer may not "improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Ibid. In this regard, it determined that the identification was the only evidence against the defendant, and that identification "raise[d] several concerns" with respect to reliability. Id. at 26, 27.

Here, neither Hamer nor Brown expressly identified defendant as the assailant at trial. Both officers testified that defendant resembled the suspect

from the video footage in the context of explaining to the jury why they had probable cause to arrest him. During Hamer's testimony while the video was played for the jury, he referred to the perpetrator as "the individual" and did not indicate that defendant was that individual. Further, neither officer expressed an opinion on defendant's guilt or innocence.

This case is further distinguishable from Lazo because both Hamer and Brown had personal knowledge of defendant's appearance. Indeed, Lazo involved a situation where the entirety of the officer's observations of defendant consisted of the photo array and the composite sketch. Id. at 14. Here, both officers gained their initial knowledge of the suspect's physical attributes by viewing the surveillance footage and shortly thereafter they confronted defendant at his home. In addition, the jury viewed the surveillance video multiple times and were able to make their own conclusion as to whether defendant was the man in that video.

And, the Lazo Court placed great weight on the fact that "[t]he victim's identification was the only evidence linking defendant to the crime. No physical evidence or other corroboration of the identification was presented." Id. at 15. Here, although Aslam did not identify defendant as the perpetrator, the jury was presented with other evidence indicating that defendant was the man in the

surveillance video.  For example, the suspect's car depicted in the video was registered to the address where the police found defendant, the car keys were admitted into evidence, Tutt testified that defendant drove her car to work, and the officers discovered clothing in plain view that resembled the assailant's clothing from the video.  And, as noted, the jury reviewed the video itself.

VII.

Defendant, in Point IV, also maintains that the court erred by not granting his motion for a judgment of acquittal or a new trial following the guilty verdict. He avers that because "[t]he court's decision was based on a flawed identification of [defendant] as the assailant" and inconsistent testimony regarding a description of the perpetrator's height as compared to defendant's height rendered the jury's verdict against the weight of the evidence.  We disagree.

Rule 3:18-1 provides "[a]t the close of the State's case or after the evidence of all parties has been closed, the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal . . . if the evidence is insufficient to warrant a conviction."  Even if no motion is made during the pendency of trial, under Rule 3:18-2, "[i]f the jury returns a verdict of guilty . . . , a motion for judgment of acquittal may be made . . . or it may be renewed

within 10 days after the jury is discharged or within such further time as the court fixes during the 10-day period." If the court grants this motion, it "may set aside a verdict of guilty and order the entry of a judgment of acquittal . . . ." Ibid. To determine if the trial judge should have acquitted defendant, we conduct a de novo review of the trial court's ruling. State v. Dekowski, 218 N.J. 596, 608 (2014).

"On a motion for judgment of acquittal, the governing test is: whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged." State v. D.A., 191 N.J. 158, 163 (2007); accord Dekowski, 218 N.J. at 608; Reyes, 50 N.J. at 458-59.

Here, viewing the evidence in a light most favorable to the State, the court did not abuse its discretion in not granting a judgment of acquittal. The State presented the surveillance video of the robbery, which was reviewed by the jury. The jury was also able to weigh the credibility of the testifying witnesses, including defendant. Further, as noted, the clothing recovered at defendant's home was admitted at trial and the jury was able to compare that clothing with

the clothing the perpetrator was wearing in the video. And, the jury knew that the license plate in the video matched the license plate of the vehicle outside of defendant's home, that defendant had permission from Tutt to drive that vehicle, and that the victim provided a description of the assailant that a reasonable juror could have concluded was the defendant.

## VIII.

In Point V, defendant asserts that the trial court improperly denied his motion to proceed pro se. Specifically, he argues that the court erred by denying his motion for his lack of "substantive knowledge" instead of the "knowing and intelligent" standard outlined in State v. Reddish, 181 N.J. 591 (2004). In this regard, he maintains that he satisfied the Reddish standard and his motion should have been granted. We disagree.

Our Supreme Court, citing to Faretta v. California, 422 U.S. 806, 821 (1975), held, "[t]he corollary to the right of a criminal defendant to be represented by an attorney is the defendant's right to represent himself." State v. King, 210 N.J. 2, 16 (2012). Although that right is "not absolute" and "cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts," id. at 18, the risks

associated with defending oneself do not provide a "basis to deny a defendant the right to make that choice," id. at 17.

As a trial court engages in the obligatory colloquy with a defendant, "its goal is not to explore a defendant's familiarity with 'technical legal knowledge[,]' for that is not required. Rather, 'the trial court must question defendant to ascertain whether he actually understands the nature and consequences of his waiver.'" Id. at 19 (alteration in original) (citation omitted) (quoting Reddish, 181 N.J. at 594, 595). A court should not focus on "whether a pro se defendant will fare well or badly," but it must "ensure that he knows and understands that, by his choice, he may not do well." Reddish, 181 N.J. at 592. Questions on "technical legal knowledge" are "essentially immaterial," and the pertinent determination is whether the defendant "comprehended the risks and consequences of acting as his own attorney." King, 210 N.J. at 20-21.

A defendant's right to self-representation may be exercised only following a knowing and intelligent waiver of the right to representation by counsel. Reddish, 181 N.J. at 587, 592. Therefore, the court must engage in a searching inquiry on the record of a defendant who wants to represent himself, State v. Crisafi, 128 N.J. 499, 509-10 (1992), and ascertain whether he or she is adequately informed of:

(1) the nature of the charges, statutory defenses, and possible range of punishment; (2) the technical problems associated with self-representation and the risks if the defense is unsuccessful; (3) the necessity that defendant comply with the rules of criminal procedure and the rules of evidence; (4) the fact that the lack of knowledge of the law may impair defendant's ability to defend himself or herself; (5) the impact that the dual role of counsel and defendant may have; (6) the reality that it would be unwise not to accept the assistance of counsel; (7) the need for an open-ended discussion so that the defendant may express an understanding in his or her own words; (8) the fact that, if defendant proceeds pro se, he or she will be unable to assert an ineffective assistance of counsel claim; and (9) the ramifications that self-representation will have on the right to remain silent and the privilege against self-incrimination.

[State v. DuBois, 189 N.J. 454, 468-69 (2007).]

Every reasonable presumption will be indulged against waiver. State v. Kordower, 229 N.J. Super. 566, 577 (App. Div. 1989). This is because "[t]he competence necessary to make a knowing and intelligent waiver of counsel is different from the competence to conduct a defense." Reddish, 181 N.J. at 592. Although technical legal knowledge per se is not relevant to the question of whether a defendant can represent himself, a defendant must "know in a basic fashion the fundamental legal rights and issues that will be affected by his decision." Ibid. The court also "must determine whether a defendant's 'understanding' is real or feigned" and "must be sensitive . . . to attempts by a

44

defendant to claim 'knowingness' merely to assuage the court's concerns about the consequences of pro se representation." Id. at 594. A knowing and intelligent waiver means that the defendant understands the implications of his waiver and that the "choice is made with eyes open." Id. at 592 (citing Faretta, 422 U.S. at 835).

Here, while the court at times appeared to stress defendant's lack of substantive knowledge, we are satisfied that it did not abuse its discretion in denying defendant's motion to proceed pro se. A considered review of the transcripts of both proceedings in which the court conducted its inquiry reveals that although defendant provided responses to the court's questioning, those responses were general and superficial and did not evidence that he appreciated the "fundamental legal rights and issues that will be affected by his decision." Ibid.

Before denying defendant's request to represent himself, the trial court explored on the record most, if not all, of the Crisafi/Reddish/DuBois factors during the proceedings on February 16, 2017, and March 7, 2017. Indeed, the court reviewed several of these factors with defendant more than once. Specifically, the court painstakingly went over with defendant the nature of his charges, the elements of those charges, his right to present any defenses, and his

potential sentencing exposure. The court conducted its inquiry using open-ended questions, consistent with <u>Reddish</u>, 181 N.J. at 594-95.

As noted, defendant's responses to many of the court's questions were generalized and sometimes nonsensical. For example, when the court asked defendant whether he understood that his dual role as counsel and accused could hamper the presentation of his defense, he replied "[n]o sir . . . I know I'm going to be limited to certain things I can say or present but that would be going towards anything I want to say as far as . . . taking the stand. That's <u>the only way</u> that it can hamper my defense." (emphasis added). Similarly, with regard to the balance of his role as counsel and his right against self-incrimination, defendant stated "if I'm representing the facts of the case, it's not going to . . . bear no [sic] harm on me as far as not being able to bring up issues concerning myself." Those responses clearly indicated that defendant was not, in fact, fully aware of the breadth and severity of the dilemmas involved in presenting a defense as the accused.

We acknowledge that at times, defendant provided answers to the court's questioning that indicated some degree of knowledge and willingness. By way of example, he indicated partial familiarity with the elements, defenses, and sentencing risks in relation to his charges, as shown by his definition of the

A-2495-17T2

elements of first-degree robbery, although it appeared that defendant read a number of his responses from a book on the table in front of him, including at one point reciting verbatim a portion of the table of contents of the New Jersey Rules of Evidence.  And, he stated that he would rely on standby counsel to mitigate the risks regarding technical issues and his compliance with the Rules (although he vacillated on whether current counsel would remain in that role). We are satisfied, however, that the court reviewed defendant's responses comprehensively and consistent with Reddish.  Again, we conclude from our review of the transcripts that the court did not abuse its discretion in denying defendant's application, as it appears that defendant largely feigned or exaggerated his understanding of the risks and complications of pro se representation and was not proceeding "with eyes open."  Reddish, 181 N.J. at 592 (citing Faretta, 422 U.S. at 835).[3]

---

[3] While we recognize that the court did not directly query defendant as to "the reality that it would be unwise not to accept the assistance of counsel," its rigorous, exhausting inquiry (and the reasons for its eventual denial) over the course of multiple court proceedings reveal that the topic was addressed, if not explicitly.  Further, we recognize that the court did not apprise defendant that he would be unable to bring a claim for ineffective assistance of counsel had he proceeded pro se, but we conclude that for the aforementioned reasons, defendant's waiver was not fully knowing and intelligent.  We simply are not satisfied from a review of the court's colloquy that defendant was truly aware that "by his choice, he may not do well."  Reddish, 181 N.J. at 592.

## IX.

Finally, defendant argues that the court abused its discretion when it sentenced him to an eight-year extended term. He alleges that the court misapplied State v. Pierce, 188 N.J. 155 (2006), and failed to consider and properly weigh the aggravating and mitigating factors. He specifically maintains the court failed to provide an explanation in support of finding aggravating factor nine, and that the court improperly failed to apply mitigating factors one, "[t]he defendant's conduct neither caused nor threatened serious harm," N.J.S.A. 2C:44-1(b)(1); two, "[t]he defendant did not contemplate that his conduct would cause or threaten serious harm," N.J.S.A. 2C:44-1(b)(2); and ten, "[t]he defendant is particularly likely to respond affirmatively to probationary treatment," N.J.S.A. 2C:44-1(b)(10). We disagree.

Sentencing determinations are entitled to deference. State v. Fuentes, 217 N.J. 57, 70 (2014). When imposing a sentence, "[a] trial court should identify the relevant aggravating and mitigating factors, determine which are supported by a preponderance of the evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210 (1989) (citation omitted). Appellate courts are not to substitute their judgment

for the trial court's judgment simply because the appellate court would have reached a different result.  State v. Lawless, 214 N.J. 594, 606 (2013).

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In addressing the aggravating and mitigating factors, the court must engage in a qualitative weighing process, evaluating each of the aggravating and mitigating factors and explaining that evaluation on the record in sufficient detail to permit appellate review.  State v. Towey, 114 N.J. 69, 84 (1989); Roth, 95 N.J. at 368.  A court, however, need not "explicitly reject each and every mitigating factor argued by a defendant."  State v. Bieniek, 200 N.J. 601, 609 (2010).  Rather, "[i]t is sufficient that the trial court provides reasons for imposing its sentence that reveal the court's consideration of all applicable mitigating factors in reaching its sentencing decision."  Ibid.

Under the persistent offender statute, N.J.S.A. 2C:44-3(a), a sentencing court has discretion "to impose an extended sentence when the statutory

prerequisites for an extended-term sentence are present." Pierce, 188 N.J. at 161. A defendant is statutorily eligible for an extended term under N.J.S.A. 2C:44-3 if he or she "has been convicted of a crime of the first, second or third degree and is a persistent offender." N.J.S.A. 2C:44-3(a). A person is a "persistent offender" if he or she is age twenty-one or older at the time of the offense and has been previously convicted on at least two separate occasions of two crimes when he or she was at least eighteen years old. Ibid. The latest crime, or the defendant's latest release from confinement, must also be within ten years of the date of the crime for which the defendant is being sentenced. Ibid.

Here, the court properly applied an extended term pursuant to Pierce and N.J.S.A. 2C:44-3. The sentencing court, which was the same as the trial court and as such had a complete understanding of the factual record, first determined that the "minimum statutory predicates" outlined in N.J.S.A. 2C:44-3 existed. In this regard, it noted that defendant had been convicted of first-degree carjacking and robbery in 1996, as well as second-degree resisting arrest the same year, as well as other crimes in the 1980s and 1990s, all while defendant was in his twenties and thirties. Defendant's sentence for the 1996 carjacking and robbery was "[twenty-five] years with ten years' parole ineligibility," which

brought him within the ten-year statutory range to be considered a persistent offender.

The court then weighed the applicable aggravating and mitigating factors. It properly concluded that defendant's prior record, which included other theft-related convictions, created a risk that defendant would commit another offense and that he had a record of serious offenses and noted that it placed great weight on aggravating factors three and six.

Regarding aggravating factor nine, defendant specifically argues that the court "failed to provide any explanation for finding" that aggravating factor and that "the court identified no deterrence specific to defendant." We note that our Supreme Court in State v. Jarbath, 114 N.J. 394, 405 (1989), stated: "the absence of any personal deterrent effect greatly undermines the efficacy of a sentence as a general deterrent" and that "general deterrence unrelated to specific deterrence has relatively insignificant penal value." See also State v. Gardner, 113 N.J. 510, 520 (1989) (holding that general deterrence alone was not enough to overcome the presumption against imprisonment for a first offense).

Here, the court explained that it was confident defendant would "continue to remain resistant to any deterrent, rehab, restraint, or reformation effect." It

also justified an extended term sentence by indicating that none of defendant's prior sentences have deterred him from criminal conduct. As such, we conclude the court clearly appreciated "the <u>need</u> for deterring the defendant . . . from violating the law," N.J.S.A. 2C:44-1(a)(9) (emphasis added), and did not abuse its discretion in applying that aggravating factor.

The court also did not abuse its discretion in failing to apply mitigating factors one and two. To determine whether a defendant caused or threatened serious harm, a court is tasked with examining the circumstances of the offense itself. <u>State v. Molina</u>, 114 N.J. 181, 185 (1989). Here, defendant argues that because he was convicted only of third-degree theft, mitigating factors one and two must apply because that conviction "entailed no violence, no harm to the victim[,] and no intention to harm the victim." However, based on the sentencing judge's (who was also the trial judge) familiarity with the evidence, particularly the surveillance videos, which we have independently reviewed, we conclude that the court did not abuse its discretion.

There was sufficient credible evidence in the record for the court to conclude by a preponderance of the evidence that defendant threatened harm to Aslam in the course of committing the offense. As shown by both angles

recorded in the surveillance video, defendant advanced upon Aslam and Aslam fell to the ground behind defendant's car, which was still running.

And, as to mitigating factor ten, whether the defendant is "particularly likely to respond affirmatively to probationary treatment," N.J.S.A. 2C:44-1(b)(10), defendant contends that because his presentence report recommended "non-custodial probation," the court should have sentenced him to the same. However, as noted, the court noted at sentencing its belief that "no matter what sentence [it] impose[s] the defendant has and will continue to remain completely resistant to any deterrent, rehab, restraint or reformation effect." We conclude that the court provided sufficient reasoning for a determination that mitigating factor ten did not apply. See Bieniek, 200 N.J. at 609.

To the extent we have not specifically addressed any of defendant's arguments, it is because we find insufficient merit in those contentions to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2495-17T2