IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 27, 2022

**DALE VINSON MERRITT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County
Nos. 114584, 114585     Steven W. Sword, Judge**

_____

**No. E2021-01095-CCA-R3-PC**

_____

The petitioner, Dale Vinson Merritt, appeals the denial of his petitions for post-conviction relief, which petitions challenged his convictions of delivery of less than 15 grams of heroin within a drug-free zone in case number 114585 and possession with intent to sell or deliver more than 15 grams of heroin in case number 114584, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and TOM GREENHOLTZ, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Dale Vinson Merritt.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kenneth Irvine, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This post-conviction case arises from two Knox County Criminal Court trial cases, case number 104491 ("Case 1") and case number 105594 ("Case 2"). In Case 1, a jury convicted the petitioner of one count of delivery of less than 15 grams of heroin within 1,000 feet of a park and one count of delivery of less than 15 grams of heroin within 1,000 feet of a child care agency, and the trial court merged the convictions and imposed a sentence of 17 years' incarceration. *State v. Dale Merritt*, No. E2017-01200-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Apr. 6, 2018). The evidence at trial showed that Jessica Poindexter "called the [petitioner] . . . on October 31, 2014, and arranged for him to bring her three baggies of heroin." *Id.*, slip op. at 7. Knoxville Police Department

("KPD") officers Philip Jinks and Adam Broome "observed Ms. Poindexter get into a gray Malibu, engage in what appeared to the officers as a 'transaction' or 'hand-to-hand contact,' and exit the Malibu. Upon approaching Ms. Poindexter . . . , Officer Jinks saw that Ms. Poindexter was holding an open baggie of heroin and a pair of tweezers." *Id.* The license plate on the gray Malibu matched that of an Enterprise rental car that had been rented to the petitioner from October 24, 2014 to November 3, 2014. *Id.* Ms. Poindexter identified the petitioner as the "man who sold her three baggies of heroin." *Id.*

In Case 2, a jury convicted the petitioner of one count of possession with intent to sell more than 15 grams of heroin and one count of possession with intent to deliver more than 15 grams of heroin, and the trial court merged the convictions and imposed a sentence of 12 years' incarceration aligned consecutively to the 17-year sentence in Case 1. *State v. Dale Vinson Merritt*, No. E2017-01199-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Apr. 18, 2018). The evidence at trial showed that on November 20, 2014, KPD officers went to the petitioner's home, where the officers arrested and searched the petitioner, finding a cellular telephone and $1,000 cash on his person. *Id.* slip op. at 2. The officers then searched the petitioner's home and found a safe containing "plastic bags and digital scales consistent with packaging [drugs] for sale" and 69.6 grams of heroin, which had an approximate value of $15,000 to $20,000. *Id.* slip op. at 2-4. The officers found additional items they determined to be consistent with the business of drug distribution, including $1,000 cash "in a shirt hanging in the master bedroom closet"; two cellular telephones, one of which was determined to be a "dope phone" because it rang continuously during the search; three loaded handguns and a .22-caliber rifle; and a rental car parked in the driveway of the home. *Id.* slip op. at 2-5.

As required by statute, the petitioner filed separate, timely petitions seeking post-conviction relief from the convictions arising from the two separate trials.[1] The post-conviction court appointed counsel, but the petitioner continued to file numerous pro se amended petitions. Counsel filed an amended petition and second amended petition for each case, incorporating the claims from the petitioner's original petitions and further fleshing out the ineffective assistance of counsel claims. Although the subsequent post-conviction filings were designated by their individual case numbers, the post-conviction court held a joint evidentiary hearing because the claims in both cases alleged the ineffective assistance of the same two attorneys. Attorney A represented the petitioner during the trial in Case 1 and during the pretrial proceedings in Case 2. Attorney B

---

[1] Post-conviction case number 114585 relates to Case 1, and post-conviction case number 114584 relates to Case 2. Tennessee Code Annotated section 40-30-104(c) requires a post-conviction petitioner to file separate petitions to attack judgments in separate cases. In the present case, the post-conviction court addressed the separate petitions in a single hearing and a single order. Ideally, the court should have disposed of the separate petitions in separate orders, but undoubtedly, we would consolidate separate appeals, and so the case proceeds on the basis of one appeal.

represented the petitioner during the trial in Case 2 and during the direct appeal of both Case 1 and Case 2.

At the June 9, 2021 evidentiary hearing, the petitioner testified that Attorney A represented him in Case 1 through trial and prior to trial in Case 2 before Attorney B took over in Case 2. Attorney B represented the petitioner on appeal in both cases. The petitioner testified that Attorney A filed a motion to suppress in Case 1 but said that he did not know why counsel did so because "[t]here shouldn't have been a motion to suppress filed in that case at all." The petitioner said that he was confused because Attorney A "never came to see me to discuss the defense strategy of filing a motion to suppress" in Case 1. He said that the "[o]nly time [Attorney A] came to see me was in lockup" at the courthouse.

The petitioner said that Attorney A also filed a motion to suppress in Case 2 and that the trial court held a hearing on the motion. He said that he wrote letters to Attorney A "explaining to him that I needed to testify at the motion to suppress[] . . . hearing. I explained to [him] that [there] was a CD that showed what took place at my home." According to the petitioner, despite his letters, Attorney A "did not adequately investigate the CD." The petitioner said that he did not remember being present at the suppression hearing but acknowledged that, according to the transcript, he was present. He said that although he was present for the hearing, he was not aware of the reason for the hearing at the time because Attorney A "never sat down with me and . . . talked about anything dealing with the suppression hearing." The petitioner reiterated that Attorney A "did not adequately investigate what took place at my house" at the time of the search and never discussed the matter with him.

The petitioner said that if Attorney A had called him to testify at the suppression hearing in Case 2, he would have testified that on November 20, 2014, he answered a knock at his door and saw Officer Craig McNew at the front door and "two other officers . . . go through on the side of my house to my back door." Officer McNew told him that he had a capias warrant for the petitioner for the sale and delivery of heroin but told the petitioner that he did not have a copy with him. Officer McNew "made a call from the side of the house," and Officers Philip Jinks and Mike Waggoner "come from the side of the home," "around the corner." Officer Jinks asked the petitioner if he could search the house. The petitioner asked if the officer had a search warrant, and Officer Jinks said that he did not, but "looked at my son's mother, kind of g[a]ve her a little -- I mean, you know, like, see what she would say. She says, well, I'm not on his lease." At that point, the petitioner said that he denied consent to search the house. Officers then arrested the petitioner and "put me in the squad car." From the patrol car, the petitioner saw a conversation between Officer Jinks and his son's mother but could not hear the substance

-3-

of the conversation. He then saw officers enter his house despite his having denied consent to search and despite his son's mother not being on his lease or paying rent.

The petitioner said that he discussed the suppression issue in Case 2 with Attorney B after Attorney B took over the case. He also said that he wrote a letter to Attorney B telling him that he wanted the suppression issue raised on direct appeal but that Attorney B "never responded to my letter." He asserted that Attorney B effectively failed to raise the issue on appeal because he failed to include a transcript of the suppression hearing in the record on direct appeal. He reiterated that if either Attorney A or Attorney B had investigated thoroughly, they would have discovered a CD that contained a recording of the events at the petitioner's house, and that the recording would have shown the petitioner standing "out in front of my door with my son['s] mother" telling the officers, "no, that they could not enter my house without a search warrant," and the officers' putting him in a patrol car before entering "the house and tak[ing] out whatever they wanted without a search warrant."

The petitioner testified that Attorney A failed to object to improper closing arguments by the State in Case 1, saying that the State improperly vouched for a witness, made inflammatory comments, stated facts outside the record, and violated his privilege against self-incrimination.

During cross-examination, the petitioner said that he believed that during closing arguments in Case 1, the prosecutor improperly commented on his right to remain silent when he quoted from Ms. Poindexter's testimony that the petitioner was going to deliver heroin to her. The petitioner maintained that Attorney A never came to visit him at the detention center and never discussed a case strategy with him. He acknowledged that Attorney A sent his investigator and his "paralegal" to visit him on one occasion but said that he wished to speak directly with Attorney A and not with his associates. As to Case 2, the petitioner said that had Attorney A discovered the CD of the recording of the events at his house, it would have disproven Officer Jinks's testimony about which officers were present at the time.

Attorney A testified that the petitioner retained him to represent him on Case 1 and Case 2. At that time, Attorney A worked at a firm where he had an associate attorney that practiced with him. Attorney A said that the petitioner also "got the services" of his "in-house investigator, and all of our support personnel, as well as my other associates." He said that his investigator was involved in the petitioner's case "from the very beginning" and assisted Attorney A "on a daily basis." Attorney A recalled that he "filed some motions to suppress" in both cases. Attorney A said that it was his practice to meet with all clients and to accompany his investigator to meet with clients. He said, "I would have met with [the petitioner] and we would have gone over things." He recalled specifically that the

State had "conveyed an offer" and that he "had conveyed that to [the petitioner]," which conversation, he said would have been "a formal discussion" that would have occurred at the detention facility and not at the courthouse lockup. Attorney A said that his memory of Case 2 was that Officers Jinks and Broome went to the petitioner's house. He did not remember Officer McNew "being involved at that point in time. It was my understanding that Officer McNew would have been involved from an evidentiary standpoint or something of that nature."

During cross-examination, Attorney A testified that he sent his investigator to meet with the petitioner at the detention facility in preparation for Case 2. He recalled visiting the petitioner at the detention facility himself but could not remember the number of times. He said that he turned over all his notes on the case to Attorney B and could not review his notes to determine how many visits he had made. He explained that he would not be surprised if his name did not appear on the petitioner's visitation records because usually only "one of the attorneys would sign in. We didn't both have to sign in."

Attorney A reiterated that he "[a]bsolutely" discussed the motion to suppress in Case 2 with the petitioner before the hearing. "I sent him copies of it . . . as well as copies of the discovery." He said that he and the petitioner had "no discussions with regards to . . . [the petitioner's] wanting to testify at a motion to suppress" hearing and that he did not "recall [the petitioner's] requesting to testify." He noted that it "would have been [the petitioner's] right to do so, but it would have been particularly imprudent." He said that it was his practice to "always advise an individual that he has a right to testify" but said that in his 31 years of practice he had never "had an individual testify at a motion to suppress hearing in which they're the defendant facing the type of felony charges that [the petitioner] was." He added, "I think it would have been absurd for [the petitioner] to have done so."

On rebuttal, the petitioner testified that prior to his trial in Case 1, he was detained at the Knox County detention facility for 10 months and that prior to his trial in Case 2, he was incarcerated with the Department of Correction and was transported between that facility and the Knox County detention facility. The petitioner referenced a printout of his visitor history from the Knox County detention facility and acknowledged that the printout showed the names of Attorney A's investigator and associate attorney. He also acknowledged that the printout showed the name of his initial attorney visiting him on four occasions in April 2015, before he retained Attorney A. He pointed out that Attorney A's name did not appear on the printout.

The post-conviction court took the matter under advisement and told the petitioner that he could file an authenticated copy of the visitation records as a late-filed exhibit. The trial court issued a single written order denying post-conviction relief in both

cases on June 23, 2021, two weeks after the evidentiary hearing but before the petitioner filed an authenticated copy of the jail visitation records on July 24, 2021. It appears from the record that post-conviction counsel requested the records from the Knox County Sheriff's Department on June 14, 2021, and that the Sheriff's Department provided the records to counsel on June 29, 2021.

In its written order denying post-conviction relief, the post-conviction court explicitly accredited Attorney A's testimony that he investigated the case and visited the petitioner "multiple times to discuss the facts" and that he used his investigator and "all the resources of his office" in preparing the petitioner's case. As relevant to this appeal, the court found that the petitioner's testimony that he wished to give at the suppression hearing would not have changed the outcome of the hearing and concluded that Attorney A did not perform deficiently by failing to call the petitioner to testify at the hearing. The court specifically found the petitioner's testimony that his son's mother did not live at the residence incredible. The court implicitly accredited Officer Jinks's testimony at the suppression hearing over that of the petitioner because the court determined that the petitioner's testimony would not have changed the court's factual findings at the hearing. The post-conviction court also found that the State's comments in closing arguments were supported by the evidence adduced at trial and were not improper and that Attorney A did not perform deficiently by failing to object.

In this appeal, the petitioner argues that Attorney A performed deficiently by failing to call him to testify at the suppression hearing in Case 2 and by failing to object to the State's closing argument in Case 1. He also argues that the cumulative effect of the errors committed by Attorney A prejudiced the petitioner. Additionally, the petitioner argues that because the post-conviction court issued its order denying relief before receiving the late-filed jail visitation records, which, he asserts, contradict Attorney A's testimony about his visiting the petitioner at the detention facility, the post-conviction court erred by accrediting Attorney A's testimony on the matter. He asks this court to either grant post-conviction relief or remand to the post-conviction court for additional findings of fact based on the late-filed visitation records. The State argues that the post-conviction court properly denied relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79

(Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to establish that he is entitled to post-conviction relief. First, even if Attorney A performed deficiently by failing to call the petitioner to testify at the suppression hearing in Case 2, the petitioner was not prejudiced by Attorney A's conduct. At the suppression hearing, Officer Jinks testified that he and other officers went to the petitioner's house to serve a capias warrant and take the petitioner into custody. He said that when the petitioner answered the door, the officers "immediately" took him into custody and "placed him in the back of the patrol car." The petitioner's girlfriend at the time also came to the door and "was pretty upset." Officer Jinks said that he "asked if I could come in and talk to her" and that "[s]he said yes" before leading Officer Jinks to the living room. Officer Jinks said that he "explained to her the

-7-

situation why [the petitioner] was being arrested, that it was a heroin investigation, and I asked if we could search the residence." When the petitioner's girlfriend indicated that she did not know if she could consent to the search because she was not on the lease, Officer Jinks asked whether she lived at the residence, and "[s]he said that she had been living there about a month." Officer Jinks said that he "explained to her that I felt that . . . she was qualified to give or . . . decline to give consent based on her resident status there." The petitioner's girlfriend then told Officer Jinks, "'Okay. You have a job to do. Go ahead.'" Officer Jinks began "searching the residence there shortly after." Officer Jinks denied that the petitioner told him that he did not have permission to search the house.

The petitioner's testimony proffered at the evidentiary hearing, even if given at the suppression hearing, would not have changed the trial court's ruling. Officer Jinks's implicitly-accredited testimony established that the petitioner did not tell the officers that they could not search the house. Moreover, the petitioner's testimony that he saw Officer Jinks conversing with the petitioner's girlfriend before entering the house is consistent with Officer Jinks's testimony that he asked whether they could go inside the house to talk. The petitioner admitted that he did not hear the substance of the conversation between his girlfriend and Officer Jinks. The post-conviction court found that the petitioner's girlfriend lived at the residence with the petitioner, and the record does not preponderate against that finding.

It is well-settled that a co-habitant, or one "who has common authority over the . . . residence," has authority to consent to the search of the residence. *See State v. Bartram*, 925 S.W.2d 227, 231 (Tenn. 1996); *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Although "a physically present co-occupant's stated refusal to permit entry prevails" over the consent of a co-occupant, *see Randolph*, 547 U.S. at 106, consent given by one occupant after the objecting co-occupant has been removed from the premises by police is sufficient to permit a lawful search so long as the removal of the objecting occupant was objectively reasonable. *Fernandez v. California*, 571 U.S. 292, 302 (2014) ("We therefore hold that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason."). Consequently, even if the petitioner denied consent before his being removed from the scene, the petitioner's being arrested and placed in a patrol car pursuant to a capias warrant rendered him absent from the premises, and his girlfriend's subsequent consent to search was sufficient to authorize the search. *See id.* (search was lawful when a co-occupant consented to a search of a shared residence after the objecting co-occupant was arrested and placed in a patrol car); *see also State v. Jay W. Edwards*, No. E2019-02176-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., Knoxville, June 22, 2021) ("Because the defendant was absent from the residence he shared with the victim due to his lawful arrest, her consent to search the residence, given his absence, was sufficient to permit the officers to search."). Consequently, the petitioner has failed to show that he was prejudiced by Attorney A's

failure to call him to testify at the suppression hearing.

Next, we agree with the post-conviction court's conclusion that the State's closing arguments in Case 1 were not improper and, consequently, that Attorney A did not perform deficiently by failing to object. The petitioner asserts that counsel should have objected to the State's following comments regarding the testimony of State witness Jessica Poindexter:

> But [Ms. Poindexter] understands she's got to come in and tell the truth 'cause that was part of the agreement she made, that if she doesn't tell the truth, she could lose that deal, and what she told you matches exactly what unfolds on the scene, what the officers see, what they find on her.
>
> . . . .
>
> . . . . That's corroboration of what [Ms. Poindexter] says. She has told the officers, 'Here's my phone. I'm calling Dboy to get my dope.' There's calls. A call to Dboy. The officer talks about [it] afterwards. The phone is ringing. Dboy's calling in . . . .
>
> . . . .
>
> . . . . [Ms. Poindexter] got a heck of a deal to come in here and be able--and be willing to testify against a heroin dealer, a person that is out there putting poison on our streets.

The petitioner contends that each of these statements constituted improper vouching of a witness and that the final statement was an attempt to inflame the jury and called for the jury to convict the petitioner to "send[] a message to the community." The State's explaining why a witness had reason to tell the truth or pointing out that the evidence corroborated the witness's testimony is not improper vouching because it did not "express [a] personal belief or opinion as to the truth or falsity" of the witness's testimony. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citation omitted). Additionally, the State's referring to the petitioner as a "heroin dealer" and metaphorizing dealing heroin to "putting poison on our streets" was not improper because the evidence supported the argument that the petitioner dealt heroin. *See State v. Brandon Scott Donaldson*, No. E2020-01561-CCA-R3-CD, 2022 WL 1183466, at *18 (Tenn. Crim. App., Knoxville, Apr. 21, 2022) (concluding that the State's calling the defendant a "poison-peddl[er]" and "dope-deal[er]" during closing arguments was improper "because the

-9-

defendant's alleged drug dealing . . . was completely irrelevant to the issues presented at trial"). Finally, the State's comments did not rise to the level of asking the jury to convict the defendant on any issue broader than guilt or innocence. Consequently, Attorney A did not perform deficiently by failing to object to the State's closing arguments.

As to cumulative error, even if the petitioner had established that Attorney A had performed deficiently by failing to call him as a witness at the suppression hearing in Case 2 and by failing to object to the State's closing arguments in Case 1, he would not be entitled to cumulative assessment of prejudice because the instances of deficient performance arose from two separate trial cases.

Finally, the late-filed jail visitation records are irrelevant to the issues on appeal, and we see no need for further fact finding by the post-conviction court. Indeed, the post-conviction court considered the petitioner's testimony about the absence of Attorney A's name on the visitation record.

Accordingly, the judgments of the post-conviction court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE